2020 UT App 69

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
GILBERTO MARTINEZ,
Appellant.

Opinion
No. 20180131-CA
Filed April 30, 2020

Fourth District Court, Provo Department
The Honorable Darold J. McDade
No. 171401154

Aaron P. Dodd, Attorney for Appellant

Sean D. Reyes and Lindsey Wheeler, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and KATE APPLEBY concurred.

HARRIS, Judge:

¶1      A jury convicted Gilberto Martinez of sodomizing his
five-year-old step-granddaughter (A.O.). Martinez now appeals
his convictions, asserting that his trial attorney rendered
constitutionally ineffective assistance. We disagree, and
therefore affirm.

BACKGROUND[1]

¶2     In 2012, when A.O. was just a toddler, Martinez was introduced to A.O.'s mother (Mother), and Martinez and Mother became friends. After a while, Martinez let it be known that he was interested in pursuing a romantic relationship with Mother. Mother was (and still is) married to A.O.'s father, although he resides in Costa Rica, and she told Martinez that she was not interested in a romantic relationship. After that, Martinez continued to spend time with A.O.'s family, and began taking Mother's mother—that is, A.O.'s grandmother (Grandmother)—"out to eat," to "go shopping" and to "do more stuff together." Eventually, Martinez (who was in his thirties) and Grandmother (who was in her sixties) struck up a romantic relationship that culminated in their marriage in or about 2016.

¶3     In 2014, after she and Martinez became romantically involved, Grandmother invited him to move into the small house that she shared with Mother, then-three-year-old A.O., and A.O.'s teenage brother (Brother). The house measured about 700 square feet, and had two bedrooms, a bathroom, a family room, and a kitchen. Martinez and Grandmother shared one bedroom, Mother and A.O. shared the other, and Brother slept in the family room.

¶4     After Martinez moved into the house, he also began spending more time with and around A.O. Mother described the relationship between A.O. and Martinez as quasi-paternal, testifying at trial that Martinez "was kind of like a father figure

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly," and "we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (quotation simplified).

to [A.O.] so she was pretty close to him." A.O. began referring to Martinez as "uncle," and would "go in [Martinez's] room a lot and play with him" when he first moved in with the family.

¶5     At some point after Martinez moved in, however, A.O.'s behavior changed; according to Mother, A.O. became "very clingy" and "very afraid." In particular, she was scared to be left alone. And although at that time she had been toilet-trained for two years already and rarely had accidents, A.O. once again started wetting the bed at night. She also began having frequent nightmares and complaining of headaches and stomachaches. She would even—without explanation—suffer high fevers. Mother, understandably concerned, took A.O. to see a doctor, but the doctor could not provide Mother an explanation for A.O.'s symptoms. Mother also took A.O. to see a child psychologist (Psychologist) to discuss her symptoms. A.O. had about five visits with Psychologist, but apparently did not disclose to Psychologist any events that could be said to have caused the symptoms. At that point, Mother decided to quit her job and care for A.O. herself, because she feared that if she did not, A.O. "was going to end up in the hospital."

¶6     In September 2016, about two months after quitting her job, Mother found it necessary to travel to California to renew her passport, and she was gone for five days. While she was gone, Mother left A.O. in Grandmother's care at the family home. A few months later, in December 2016, Mother took her children, including A.O., to Costa Rica to visit A.O.'s father. While they were in Costa Rica, A.O.'s nightmares and bedwetting stopped, but, according to Mother, they returned again within a week of coming back to the house in Utah.

¶7     In or about March 2017, Mother approached A.O. and had a series of discussions with her about whether anything "bad" had happened to her. During those discussions, Mother asked A.O. whether Martinez had ever "shown her his private parts,"

and A.O. answered affirmatively. Mother then asked A.O. "what kind of things [Martinez] would do with his private parts," and A.O. stated that Martinez "put his thing in her mouth" on "maybe" two occasions, and that these events occurred in the bedroom Martinez shared with Grandmother. Mother then took A.O. back to see Psychologist, who advised Mother to contact Child Protective Services.

¶8 Mother contacted Child Protective Services, which set up an interview with A.O. on March 29, 2017, just a couple of days later. A.O. told the interviewer (Interviewer) that her "uncle" put his "private parts" in her mouth, and that it happened "two times," both while Mother was in California. A.O. acknowledged to Interviewer that both Grandmother and Brother were at home at the time, but stated that Grandmother was in the kitchen "cooking for like ten hours," and Brother was playing video games. A.O. did not tell Mother or Interviewer that Martinez committed any other acts of abuse; specifically, A.O. did not mention to either Mother or Interviewer that Martinez had also put his penis inside her vagina.

¶9 After A.O's interview, police were contacted and Martinez was arrested. Martinez's native language is Spanish, and he speaks and understands only "basic English." At the time of his arrest, one officer attempted to read him his *Miranda*[2] rights, but that officer's Spanish language skills were limited, so he was unable to complete the task, informing Martinez only of his right to remain silent and that he had a "right to have an attorney present but between questions or of any time, if you want, an attorney to come it could be here."[3] Another officer, for

---

2. *Miranda v. Arizona*, 384 U.S. 436 (1966).

3. The *Miranda* warnings given to Martinez, as well as the entirety of his interview with police, were given and conducted

(continued…)

whom Spanish was his native language, then took over the interview, and advised Martinez, in Spanish, as follows:

> You have the right to remain silent, any question that you have, ah, anything you say can be used against you in a court of law, you will have the right to have an attorney present while we ask questions, um, if you don't have one the state can provide you one to represent you, ok? After having finished with your present rights, do you want to speak with us now?

In response, Martinez stated that "I don't know if I'm OK or in trouble, but they said to me that I was going to speak with you guys." Martinez continued to answer questions, and did not seek to terminate the interview or request an attorney.

¶10 As the interview progressed, officers asked Martinez if A.O. had ever been inside his bedroom, and Martinez initially stated that A.O. had "never been to [his] room, before." Immediately thereafter, however, after officers expressed skepticism that the two of them could live in the same small house for years and never be in the bedroom at the same time, Martinez clarified that A.O. had, in fact, "maybe" been inside his bedroom "once or twice." But he denied that he had ever been alone with A.O. inside his bedroom, stating that he made sure that was the case because "he didn't want to be accused of something" that he did not do.

---

(…continued)
in Spanish. We quote here from a translation of that interview into English that was submitted to the trial court and made part of the record on appeal; no party takes issue with the linguistic accuracy of that translation.

¶11    After completing its investigation, the State charged Martinez with two counts of sodomy on a child, both first-degree felonies, and the case proceeded to a two-day jury trial in August 2017. The State called six witnesses: Mother, A.O., Interviewer, Psychologist, and two police officers. During Interviewer's testimony, the State also played for the jury a video recording of A.O.'s interview at Child Protective Services.

¶12    During her time on the witness stand, A.O.—who was six years old at the time of trial—told the jury, as she had previously told Mother and Interviewer, that Martinez put his penis in her mouth while Mother was in California. This time, however, she stated that he had done this "five times" instead of just two, even stating at one point that Martinez might have done this five times in a single day. Also, during her trial testimony, A.O. stated, for the first time on record, that Martinez had put his "private part" not only into her mouth, but also into her "private part" "between [her] legs."

¶13    Mother testified about the symptoms that A.O. had been experiencing, and described her efforts to figure out what might have been causing them. Martinez's trial counsel (Trial Counsel) cross-examined Mother extensively, focusing on some of the leading questions that she had asked A.O. during her initial questioning, and establishing that Mother had not received any training about how to interview victims of child abuse. The State also called Psychologist as an expert witness to testify about some of the symptoms exhibited by children who have been sexually abused, and to testify that children sometimes delay disclosure of abuse.

¶14    One of the law enforcement officers—the one who was a native Spanish speaker—testified about Martinez's police interview, and told the jury that Martinez initially had denied that A.O. had ever been in his room, but then later "changed" his story and admitted that A.O. had been inside his room on a few

occasions. Trial Counsel cross-examined the officer with a transcript of the interview, and established that Martinez's clarification occurred in "the sentence after" he made his initial statement, rather than toward the end of the interview.

¶15    Trial Counsel cross-examined all of the State's witnesses but, after the conclusion of the State's case-in-chief, he elected not to call any witnesses. Specifically, he decided not to call Martinez to testify in his own defense, and—despite the fact that he had mentioned in his opening statement that she would testify—decided not to call Grandmother. Trial Counsel's cross-examination of the State's witnesses, as well as his closing argument, focused especially on inconsistencies in A.O.'s version of events, and on the theory that Mother had coached A.O. to testify as she did or, at minimum, asked enough improper leading questions of A.O. to put ideas in her head of events that may not actually have happened. Trial Counsel called into question the credibility of both Mother and A.O., and asked the jury not to credit their testimony. But after deliberation, the jury found Martinez guilty on both charged counts.

¶16    After his conviction, Martinez obtained new counsel, and filed a motion to arrest judgment or, in the alternative, to grant a new trial, pursuant to rules 23 and 24 of the Utah Rules of Criminal Procedure. In the motion, Martinez asserted that Trial Counsel had rendered ineffective assistance in three ways: (1) he failed to move to suppress the officer's testimony about Martinez's police interview, on grounds that Martinez's *Miranda* rights had been violated; (2) he did not call Grandmother as a witness at trial; and (3) he did not call Martinez to testify in his own defense. The motion was supported by a sworn declaration from Grandmother in which she averred that, had she been called as a witness, she would have testified, among other things, that (contrary to Mother's testimony) A.O.'s symptoms did not increase after September 2016, and that she did not see Martinez and A.O. alone together during the five days she cared

for A.O. in September 2016. Martinez also submitted a declaration in connection with the reply brief in support of the motion, and therein averred that, had he taken the stand, he would have "let everyone know that [he was] innocent of the charges." The State opposed the motion, and the trial court convened an evidentiary hearing, at which Trial Counsel appeared and testified.

¶17 At the hearing, Trial Counsel testified that, although he had been practicing law for only two years at the time of trial, this case was his third trial in less than a year in which his client had been accused of sexually abusing a child. One of the other two cases resulted in a not-guilty verdict, and the other settled via plea agreement midway through trial. During his testimony, Trial Counsel stated that, with the help of a Spanish-speaking legal assistant, he had met with Martinez "at least a dozen" times prior to trial to discuss the case and develop strategy; had reviewed and discussed the discovery with Martinez; and had independently investigated the case, including interviewing witnesses and visiting the family home.

¶18 With regard to the specific issues raised by Martinez in his motion, Trial Counsel testified that he had reviewed the transcript of Martinez's police interview and analyzed it for *Miranda* problems, but that he "didn't find an issue there." As for Grandmother, Trial Counsel stated that he and Martinez had discussed "numerous times" and "at great length" the question of whether Grandmother should testify. At times, Martinez even suggested specific questions that Grandmother might be asked, and Trial Counsel then met personally with Grandmother to discuss Martinez's suggestions. In all, Trial Counsel met with Grandmother "numerous times," both in person and on the phone; indeed, he testified that Grandmother "visited [his] office almost on a weekly basis from the time [he was] retained until the time up until trial," and in addition Trial Counsel had "been to [Grandmother's] home" and had "spoken [with her] on the

phone numerous times." After repeatedly meeting with Grandmother and preparing for trial, counsel made an initial determination "that it would be helpful to have her" testify in Martinez's defense.

¶19 But as trial proceeded, Trial Counsel ultimately "decided it would not be beneficial to the case to put her on the stand." He offered several reasons that contributed to his ultimate decision. First, he became concerned about some of the "extreme positions" Grandmother was taking in the answers to some of the questions Trial Counsel put to her, and in addition identified "many contradictions" in those answers. Moreover, he recognized that Grandmother had an "obvious bias" given her relationship to Martinez, and knew that she often tended to be "very emotional." For all of these reasons, Trial Counsel "personally found [Grandmother's testimony] to be not credible," and he worried that "if [he] was having doubts" about her credibility, a jury likely would too.

¶20 Second, Trial Counsel was extremely concerned with the optics of the relationship and age disparity between Grandmother and Martinez. As he explained it,

> [t]he concern was that the allegations were sexual abuse of a child and in my opinion, I was concerned that seeing a man in his 30s married to a woman in her 60s would [raise] great concerns in the jurors, whether warranted or not. When I had spoken with anyone about the case being very general and saying hypothetically if you heard [a] 35-ish year old man with a 60 year old woman and he's been charged with allegations of sexual abuse of a child does that raise concerns on its face? And it was almost a unanimous yes.

Trial Counsel then clarified that, specifically, he was concerned that jurors would wonder "where[ Martinez is] at sexually." He

acknowledged that the jury was already aware, from testimony, of the age difference between Grandmother and Martinez, but felt that putting Grandmother on the stand would visually emphasize the age difference and "blatantly" put the issue "in their face," something he thought would be detrimental.

¶21 Third, after the conclusion of the State's case-in-chief, Trial Counsel felt that Martinez was well-positioned to win an acquittal. Trial Counsel was especially persuaded by the fact that A.O. "gave a different testimony than she had previously given," testimony which was "contradictory" to her previous interviews. Chiefly for this reason, he believed that the jury likely would acquit Martinez, and that further testimony from Grandmother (or from Martinez) might upset that balance.

¶22 With regard to the decision not to call Martinez to testify in his own defense, Trial Counsel testified that he discussed "many times" with Martinez the fact that Martinez had the right to testify. Trial Counsel told Martinez that, as he "investigated and prepared the defense," he "would be giving [Martinez] a recommendation and advising him whether he should or shouldn't testify, but ultimately it was his right." Trial Counsel met with Martinez at the jail on the night before the second day of the two-day trial, and "indicated" to Martinez that he was "leaning towards advising him not to take the stand at trial." Martinez did not give "much of a reaction" to that statement, and did not appear to be "upset." The next day, after the State finished its case-in-chief, Trial Counsel gave Martinez his final recommendation: that Martinez "shouldn't take the stand." Again, Martinez did not offer "much of a reaction," and did not protest or appear upset. As noted above, at that point Trial Counsel believed that an acquittal was likely, and he thought that Martinez's testimony would "open[] the door to hurtful things in the case," including cross-examination about his police interview and about the time he spent with A.O. Trial Counsel

never told Martinez that he could not testify, and Martinez did not insist on taking the stand.

¶23    A few weeks after this evidentiary hearing, the trial court held oral argument on the motion. At the conclusion of the argument, the court issued an oral ruling.[4] In that ruling, the court agreed with Martinez that Trial Counsel had rendered deficient performance with regard to the *Miranda*-based ineffective assistance claim, concluding that the statements made by the second police officer to *Martinez* were "ambiguous" and "deficient" because they spoke only of a future right to counsel ("you will have the right to have an attorney present") rather than a present right to counsel. But the court nevertheless determined that Martinez's *Miranda* claim failed because Martinez had not demonstrated prejudice, concluding that even if the police interview had been suppressed, its absence from the record would not have changed the outcome of the trial.

¶24    With regard to Martinez's other two claims of ineffective assistance, the court determined that Trial Counsel had not performed deficiently. The court stated that Trial Counsel's decision to not call Martinez or Grandmother to testify at trial was a "strategic decision" dependent upon "numerous factors," and noted that Trial Counsel "did not believe that the testimony from [Grandmother] or [Martinez] . . . was necessary in order to avoid a conviction." Additionally, the court noted that "any testimony by either would have been subject to cross examination, which could have potentially harmed the defendant's case," and concluded that "in light of the standards

---

4. At the conclusion of its oral ruling, the trial court asked the State to "prepare findings and an order consistent with" the ruling, but the record submitted to us does not contain any written memorialization of the oral ruling. We therefore presume that the oral ruling is the complete ruling of the court.

set by *Strickland*[5] . . . these decisions were reasonable under the circumstances." Accordingly, the trial court denied Martinez's motion to arrest judgment or, in the alternative, for a new trial.

ISSUE AND STANDARD OF REVIEW

¶25 Martinez now appeals, and asserts that Trial Counsel rendered constitutionally ineffective assistance. In most cases in which we must weigh in on the adequacy of counsel's assistance, we confront the issue for the first time on appeal, and therefore we often recite that "there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *See Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified). But this case is unusual in that Martinez did not raise his ineffective assistance claim for the first time on appeal; indeed, he raised this claim in a post-trial motion before the trial court, and the court held an evidentiary hearing before issuing a decision from the bench. In a case like this one, where "a trial court has heard a motion based on ineffectiveness of counsel" and that court's ruling is up for review on appeal, we "afford the trial court's conclusions no deference" and "review them for correctness," but we set aside its factual findings "only if they are clearly erroneous." *State v. Hay*, 859 P.2d 1, 4–5 (Utah 1993).

ANALYSIS

¶26 Martinez asks us to consider the same three issues he raised in his motion to arrest judgment before the trial court: he asserts that Trial Counsel rendered constitutionally ineffective assistance by (1) failing to move to suppress Martinez's police interview on the basis of allegedly insufficient *Miranda*

_____

5. *Strickland v. Washington*, 466 U.S. 668 (1984).

warnings; (2) failing to call Grandmother to testify during the trial; and (3) failing to call Martinez to testify in his own defense, or at least obtain Martinez's affirmative waiver of his right to testify. We first discuss the legal principles that govern claims for ineffective assistance of counsel, and then we apply these principles to each of Martinez's claims.

A

¶27 To establish an ineffective assistance claim, a defendant must make a two-part showing: (1) that his counsel's performance was deficient, in that it "fell below an objective standard of reasonableness," and (2) that this "deficient performance prejudiced the defense" such that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984).

¶28 Both of these elements require a substantial showing, because reviewing courts "indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance," *id.* at 689, and because a defendant attempting to show a "reasonable probability of a different outcome" had trial counsel not erred faces "a relatively high hurdle to overcome," *see State v. Garcia*, 2017 UT 53, ¶ 44, 424 P.3d 171. And because a defendant must satisfy both parts of this test in order to establish his claim, it is unnecessary for us "to address both components of the inquiry if we determine that a defendant has made an insufficient showing on one." *Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232 (quotation simplified).

¶29 In examining whether counsel's performance was deficient under the first part of the test, we apply "the deficiency standard announced in *Strickland*" and ask whether counsel's actions "fell below an objective standard of reasonableness." *State v. Scott*, 2020 UT 13, ¶ 31 (quotation simplified). "To prevail, a defendant must show . . . that his counsel rendered a

deficient performance in some demonstrable manner," and that counsel's "performance fell below an objective standard of reasonable professional judgment." *Archuleta*, 2011 UT 73, ¶ 38 (quotation simplified). Courts have long recognized that "[t]here are countless ways to provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. Therefore, we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

¶30    One factor courts examine, in evaluating whether an attorney performed deficiently, is whether the attorney had a strategic reason for taking the action in question. *See Scott*, 2020 UT 13, ¶ 35 (stating that "the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions"). If the court determines that the attorney had a valid strategic reason for his actions, then "it follows that counsel did not perform deficiently." *Id.*; *see also State v. Ray*, 2020 UT 12, ¶ 34 ("If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance.").

¶31    But our supreme court has recently clarified that, despite some language to the contrary in prior cases, the "converse is not true." *Ray*, 2020 UT 12, ¶ 34. A court's determination that an attorney did *not* have a valid strategic reason for his actions does not automatically mean that the attorney performed deficiently. *Id.* ("Even if an omission is inadvertent and not due to a purposeful strategy, relief is not automatic." (quotation simplified)); *see also Scott*, 2020 UT 13, ¶ 36 (stating that "even where a court cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient"). In that situation, the court must still "ask whether, in light of all the circumstances, the attorney

performed in an objectively reasonable manner." *Ray*, 2020 UT 12, ¶ 34 (quotation simplified); *see also id.* ¶ 36 (stating that, even after concluding that "there was no strategic reason" for counsel's actions, "the deficiency analysis was not at an end," because "a reviewing court must always base its deficiency determination on the ultimate question of whether counsel's act or omission fell below an objective standard of reasonableness" (quotation simplified)).

¶32    In evaluating prejudice under the second part of the test, we assess whether there exists a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently. *See Garcia*, 2017 UT 53, ¶¶ 34–38. This "reasonable probability" standard is "less exacting" than the "more likely than not standard," and is "more akin to a significant possibility of a different result." *See State v. Popp*, 2019 UT App 173, ¶ 58, 453 P.3d 657 (quotations simplified). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. In assessing whether a defendant has met this standard, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Garcia*, 2017 UT 53, ¶ 28 (quotation simplified).

B

¶33 Martinez's first complaint about Trial Counsel's performance is that Trial Counsel failed to seek suppression of his police interview on *Miranda* grounds. On this issue, we conclude that—even assuming, without deciding, that Martinez could show that Trial Counsel performed deficiently—Martinez has failed to show prejudice. We agree with the trial court that, even if Martinez had been able to suppress the contents of his

police interview, there is not a reasonable probability that the outcome of his trial would have been any different.

¶34　We agree with the State's assertion that Martinez's police interview did little to further the State's case against Martinez. In that interview, Martinez gave no confession or any other admission of crucial facts necessary to the State's case. He did, however, initially claim that A.O. had never been in his bedroom, only to clarify, immediately thereafter, that she had "maybe" been inside his bedroom "once or twice" over the years. At trial, the second officer testified that, during the interview, Martinez had "changed" his story on this point, and the State later argued from this testimony that the jury should give more weight to A.O.'s account than to Martinez's. But on cross-examination, Trial Counsel used an actual transcript of the police interview—rather than relying solely upon the second officer's recollection of it, as the State had during its examination—and elicited from the second officer an acknowledgment that Martinez's clarification about whether A.O. had ever been in his bedroom came "immediately" and "in the sentence after" Martinez first stated that A.O. had never been there. Trial Counsel then argued that Martinez's second statement was in the nature of an immediate clarification, and should not carry any negative connotations for his credibility.

¶35　In our view, neither Martinez's statement that A.O. might have been in his room on a few occasions over the years, nor the fact that this statement was slightly different than one he had just made in the previous sentence of his interview, was important enough to have changed the outcome of the trial. The statement itself was relatively innocuous, and in line with what one would expect of individuals living in close quarters over a lengthy period of time. And the fact that the statement represented an immediate clarification of a statement Martinez had just made does not strike us as the sort of thing that materially impacts a witness's credibility.

¶36    Moreover, the second officer's testimony about Martinez's police interview formed but a small part of the State's case, which was otherwise supported by the testimony of A.O., Mother, Investigator, Psychologist, and another police officer. After examining the totality of the circumstances, our "confidence in the outcome" of the trial is not significantly undermined by the testimony about the police interview, *see Strickland*, 466 U.S. at 694, and therefore we conclude that Martinez has not demonstrated a reasonable probability that the outcome of his trial would have been different had the police interview been excluded. Because Martinez cannot establish the second requisite element of this ineffective assistance claim, we have no need to address the first. *See Archuleta*, 2011 UT 73, ¶ 41.

C

¶37    Martinez's second complaint about Trial Counsel's performance is that Trial Counsel decided not to call Grandmother as a witness for the defense. On this issue, we conclude that Martinez has failed to demonstrate that Trial Counsel performed deficiently, because Trial Counsel articulated several reasonable and informed strategic reasons for electing not to call Grandmother as a witness.

¶38    As noted, as part of evaluating an attorney's performance in the context of an ineffective assistance claim, we look at whether the attorney had an informed strategic reason for taking the action in question. If the attorney can articulate such a reason, that attorney has not performed deficiently. *See Ray*, 2020 UT 12, ¶ 34 ("If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance.").

¶39    This is especially true when the matter at issue concerns a decision to introduce a particular piece of evidence, choose which defense theory to emphasize, or call a particular witness. *See State v. Tyler*, 850 P.2d 1250, 1256 (Utah 1993) (stating that

"trial tactics and strategies including what witnesses to call, what objections to make, and by and large what defenses to put forth are within the prerogative of counsel and are generally left to counsel's professional judgment"); *accord Adams v. State*, 2005 UT 62, ¶ 25, 123 P.3d 400; *State v. Curtis*, 2013 UT App 287, ¶ 39, 317 P.3d 968. In particular, an attorney's decision about whether a witness should be called to the stand "is a matter of trial strategy, which will not be questioned and viewed as ineffectiveness unless there is no reasonable basis for that decision." *See Tyler*, 850 P.2d at 1256.

¶40 In this case, Trial Counsel—during his testimony at the post-trial evidentiary hearing—articulated three separate strategic reasons why he ultimately chose not to call Grandmother as a witness. First, Trial Counsel was concerned about Grandmother's credibility. In his many interviews and meetings with her, Trial Counsel had noticed that Grandmother sometimes took unwarranted "extreme positions" on issues, and that there were "many contradictions" in the information she provided to him. He also recognized that she had an "obvious bias" given her relationship to Martinez, and knew that she tended to be a "very emotional" person. For all of these reasons, Trial Counsel "personally found [Grandmother's testimony] to be not credible," and he worried that "if [he] was having doubts" about her credibility, jurors might feel the same way.

¶41 Second, Trial Counsel was extremely concerned with the optics of the age disparity between Grandmother and Martinez. Even though the jurors already knew, from testimony, that Martinez was in his thirties and Grandmother was in her sixties, Trial Counsel was concerned that placing Grandmother on the witness stand would serve as a powerful visual reminder of the age difference, and might cause jurors to wonder about Martinez's sexual proclivities.

¶42    Finally, after the conclusion of the State's case-in-chief, Trial Counsel felt strongly that Martinez was well-positioned to win an acquittal, given that A.O.'s trial testimony differed from what she previously told Interviewer. Counsel was concerned that calling additional witnesses, including Grandmother, might result in snatching defeat from the jaws of victory.

¶43    In this context, we may second-guess Trial Counsel's proffered strategic reasons only if those reasons have "no reasonable basis." *See Tyler*, 850 P.2d at 1256; *see also Archuleta*, 2011 UT 73, ¶ 96 (stating that "reasonably informed strategic choices are almost unassailable," and that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" (quotation simplified)); *State v. Wright*, 2013 UT App 142, ¶ 20, 304 P.3d 887 (stating that "once counsel has investigated the underlying facts, strategic decisions regarding those facts cannot be deemed deficient except where there is no reasonable basis for them"). In this case, not even Martinez suggests that Trial Counsel's decision not to call Grandmother was uninformed; indeed, Trial Counsel met with Martinez and Grandmother "numerous times" to discuss her potential testimony, and he had a very good idea of what she would say if she were called as a witness.

¶44    But Martinez suggests that Trial Counsel's proffered strategic grounds for not calling Grandmother were nevertheless unreasonable, and that Trial Counsel was "not credible" during his testimony at the evidentiary hearing. Although the trial court made no specific finding as to Trial Counsel's credibility, it did credit Trial Counsel's explanations as to the reasons he chose not to call Grandmother, specifically stating during its oral ruling that Trial Counsel made a "strategic decision[]" not to call Grandmother, and that this decision was "reasonable under the circumstances." To the extent this determination is entitled to deference, *see Sawyer v. Department of Workforce Services*, 2015 UT 33, ¶¶ 19–21, 345 P.3d 1253 (noting that some "reasonableness"

determinations are "law-like" and reviewed non-deferentially, while others are fact-like and reviewed for clear error), Martinez cannot demonstrate that the trial court's determination is clearly erroneous.[6] Under that standard, we reverse a lower court's determination only if it is "against the clear weight of the evidence or if we otherwise reach a definite and firm conviction that a mistake has been made." *See Layton City v. Carr*, 2014 UT App 227, ¶ 5, 336 P.3d 587 (quotation simplified). Ample evidence, including Trial Counsel's own testimony, supports the trial court's determination of reasonableness, and therefore that determination is not clearly erroneous.

¶45 But even if we were to review the court's reasonableness determination without deference to the trial court, Martinez still cannot demonstrate that the court erred, especially given the "wide latitude" given to attorneys to make strategic decisions on behalf of their clients. *See Strickland*, 466 U.S. at 689; *see also Menzies v. Galetka*, 2006 UT 81, ¶ 89, 150 P.3d 480 (stating that "judicial scrutiny of counsel's performance must be highly deferential" in any instance, because "it is all too easy for a court, examining counsel's performance after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable" (quotation simplified)). While under oath at the evidentiary hearing, Trial Counsel articulated three colorable reasons why he decided not to call Grandmother, any one of which—if reasonable—would be sufficient to support a determination that he did not perform deficiently. And on the record before us, Trial Counsel's proffered strategic reasons each appear plausible and reasonable. Indeed, our supreme court has

---

6. The parties did not brief the question of how deferentially we should review a trial court's determination, in the ineffective assistance context, that an attorney's actions were reasonable. Because the outcome of this case does not depend on the answer to this question, we offer no opinion on the subject.

"recognized that counsel's conduct is not unreasonable when he chooses not to call a potential witness whom he deems to be inconsistent and lacking credibility." *State v. Griffin*, 2015 UT 18, ¶ 55, 441 P.3d 1166.

¶46 The fact that at least one of Trial Counsel's proffered reasons—that he thought he had the case won—later turned out to be wrong is not something we may hold against him. Indeed, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also State v. Perry*, 899 P.2d 1232, 1239 (Utah Ct. App. 1995) ("[A] reviewing court defers to counsel's choices regarding trial strategy, even if in hindsight his or her choices were incorrect.").[7]

¶47 In short, on this record, and given Trial Counsel's sworn explanation for his decisions, Martinez has fallen short of demonstrating that Trial Counsel's decision not to call Grandmother was objectively unreasonable. Accordingly,

---

7. Martinez also complains about the fact that Trial Counsel told the jury, during opening statement, that Grandmother would testify, and then neither called Grandmother nor explained to the jury why he had not. But Trial Counsel gave a reasonable explanation, during his testimony at the post-trial hearing, why he initially thought he would call Grandmother, but then changed his mind as trial progressed. As discussed herein, Trial Counsel had informed and reasonable grounds for making his decisions about whether to call Grandmother, and we are not in a position to second-guess those decisions. Neither are we in a position to second-guess his decision not to draw further attention to Grandmother's absence by explaining that decision to the jury during closing argument.

Martinez's second claim of ineffective assistance fails on the first part of the test, because Martinez has not succeeded in showing that Trial Counsel rendered deficient performance. Because Martinez cannot establish the first requisite element of this ineffective assistance claim, we have no need to address the second. *See Archuleta*, 2011 UT 73, ¶ 41.

D

¶48 Martinez's final complaint about Trial Counsel's performance is that Trial Counsel did not call Martinez himself to testify in his own defense, and did not obtain from Martinez an affirmative waiver of his right to testify. On this issue, we conclude that Martinez has failed to demonstrate that Trial Counsel performed deficiently, because Trial Counsel articulated reasonable and informed strategic reasons for electing not to call Martinez, and because Martinez had every opportunity to express his desire to testify, but never did.

¶49 During the days prior to trial, Trial Counsel discussed "many times" with Martinez the fact that Martinez had the right to testify, and that when the time came, Trial Counsel would give Martinez a recommendation as to whether he should testify. But Trial Counsel told Martinez that, regardless of the recommendation, the final decision about whether to testify was Martinez's to make. The night before the last day of trial, Trial Counsel "indicated" to Martinez that he was "leaning towards advising him not to take the stand at trial," and Martinez did not state any disagreement with this assessment. The next day, after the State finished its case-in-chief, Trial Counsel gave Martinez his final recommendation: that Martinez "shouldn't take the stand." Trial Counsel reached this decision because, as noted above, he believed an acquittal was likely, and he thought that Martinez's testimony would "open[] the door to hurtful things in the case," including cross-examination about his police interview and about the time he spent with A.O., and therefore believed

that Martinez's testimony could potentially be harmful. When Trial Counsel delivered his final recommendation to Martinez, Martinez did not offer "much of a reaction," and did not protest or appear upset. Trial Counsel never told Martinez that he could not testify, and Martinez never insisted on taking the stand.

¶50 As with Trial Counsel's reasons for choosing not to call Grandmother, we agree with the trial court that Trial Counsel's reasons for recommending that Martinez not testify were informed and reasonable. Trial Counsel believed, albeit incorrectly, that an acquittal was likely, and viewed the risks of putting Martinez on the stand as relatively high. Trial Counsel was especially concerned about the State's ability to cross-examine Martinez on various topics, including his police interview and the time he spent with A.O. Trial Counsel had met with Martinez numerous times, and had discussed his potential testimony, and knew what Martinez was likely to say if called as a witness. In this case, Trial Counsel's decision to recommend that Martinez not testify was reasonable. *See Archuleta*, 2011 UT 73, ¶ 96 (stating that "reasonably informed strategic choices are almost unassailable," and that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" (quotation simplified)). Accordingly, Trial Counsel did not perform deficiently by recommending to Martinez that he not testify.

¶51 And neither did Trial Counsel act improperly by presuming from Martinez's silence that Martinez agreed with his recommendation not to testify. Trial Counsel informed Martinez that the ultimate decision was Martinez's to make, but that Trial Counsel's recommendation was that Martinez not testify. In response, Martinez did not offer "much of a reaction," and did not express disagreement. In this situation, an attorney may properly infer, from his client's silence, that the client has acquiesced in the decision and agreed to waive his right to testify. *See United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)

(stating that a defendant "is presumed to assent to his attorney's tactical decision not to have him testify," and that a "waiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so"); *United States v. Teague*, 953 F.2d 1525, 1535 (11th Cir. 1992) (upholding a trial court's finding of waiver where the defendant "was advised of his right to testify, was advised that he should not exercise that right, and did not protest" (quotation simplified)); *see also United States v. Williams*, 139 Fed. App'x 974, 976 (10th Cir. 2005) ("When a defendant does not alert the trial court of a disagreement with his counsel regarding his right to testify, waiver of the right to testify may be inferred from the defendant's conduct." (quotation simplified)); *cf. State v. Brooks*, 833 P.2d 362, 365 (Utah Ct. App. 1992) (holding that a trial court "bears no affirmative duty sua sponte to engage in an on-the-record colloquy with defendant at the time of trial to ensure a valid waiver of the right to testify"). Accordingly, Trial Counsel did not perform deficiently by inferring from Martinez's silence, in the wake of his recommendation, that Martinez was in agreement with the recommendation and did not wish to testify.

¶52 We therefore conclude that Trial Counsel did not perform deficiently in advising Martinez not to testify. Thus, Martinez's final claim of ineffective assistance fails on the first part of the test. Because Martinez cannot establish the first requisite element of this ineffective assistance claim, we have no need to address the second. *See Archuleta*, 2011 UT 73, ¶ 41.

CONCLUSION

¶53 Martinez has not carried his burden of demonstrating that Trial Counsel rendered constitutionally ineffective assistance. Accordingly, we affirm Martinez's convictions.