**2024 UT App 152**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
TYLER ROBERT DRAPER,
Appellant.

Opinion
No. 20210738-CA
Filed October 24, 2024

Seventh District Court, Monticello Department
The Honorable Don M. Torgerson
No. 201700104

Staci Visser and Ann Marie Taliaferro,
Attorneys for Appellant

Sean D. Reyes, William M. Hains, Hwa Sung
Doucette, and Michael Palumbo,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1　Tyler Draper was charged with six counts of rape and one count of aggravated assault. The charges were based on sexual encounters that Draper had with four young women that Draper knew from his hometown or the surrounding area. At the close of a four-day trial, the jury convicted Draper of four counts of rape, but it acquitted him on the remaining charges.

¶2　Draper appeals his convictions, raising several challenges to evidentiary rulings from the district court and several claims of ineffective assistance of counsel. Contemporaneous with his brief, Draper filed a request for a rule 23B remand in which he seeks to

create a record to support many more ineffective assistance claims. For the reasons set forth below, we affirm Draper's convictions and deny his request for a rule 23B remand.

BACKGROUND

*Draper's Relationships and Sexual Encounters with the Victims*

¶3    In 2020, Tyler Draper was arrested and charged with six counts of rape and one count of aggravated assault.[1] Each count involved a young woman whom Draper had dated or had been friends with during high school or in the years immediately afterward.[2]

---

1. The State originally charged Draper with a seventh rape count based on an additional incident with another alleged victim, but that charge was dropped prior to trial.

2. The parties have referred to Draper's accusers with pseudonyms in their briefs, and we'll use those same pseudonyms in this opinion.

We note that the jury convicted Draper of rape charges relating to three women, but it acquitted Draper of the rape charge relating to a fourth, who's been referred to as Tori. As discussed below, several of the issues on appeal relate to laws discussing the rights of "victims." And as also discussed, several of the issues involve actions taken by various combinations of the four young women (including Tori). For simplicity of narrative, we'll refer to the four collectively as the "victims" (as opposed to "alleged victims" or instead differentiating when Tori was involved), while again acknowledging here that Draper was not found guilty of raping Tori.

Finally, although the jury acquitted Draper on the count relating to Tori, we'll briefly recount her allegations below because they have some relevance to some of the issues raised on appeal and have been discussed by the parties in their briefs.

¶4 We recount the relevant circumstances surrounding each victim and her interactions with Draper below. In doing so, we'll "recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Oreilly*, 2024 UT App 79, n.1, 550 P.3d 500 (quotation simplified), *cert. denied*, Sept. 12, 2024 (No. 202040790). Because this case resulted in a mixed verdict, wherein Draper was convicted on some charges but acquitted on others, we'll indicate whether particular allegations resulted in a conviction.

¶5 **Helen.** Helen and Draper are both from Monticello, which is a small town in southern Utah. Helen and Draper met in the summer of 2015 and started dating sometime later that year when Helen was a junior and Draper was a sophomore in high school. Helen and Draper began having consensual sex a month or two into their relationship. Helen later alleged that Draper had sexual intercourse with her on two occasions without her consent, and the jury convicted Draper of rape for each incident.

¶6 The first encounter occurred one night while Draper was visiting Helen at a chiropractor's office where she worked after hours doing the nightly cleaning. When Draper knocked on the door, Helen invited him in to "just sit with [her]." When Helen began cleaning again, Draper "stopped [her] and pushed [her] onto" a massage bench and started kissing her. Helen pushed Draper away and told him that she didn't want "to do this right now" because she was at work. Draper tried to persuade her by saying "they didn't have cameras," so "no one was going to find out and nobody would know." But Helen continued "pushing him and saying, no, [she] didn't want to do it there, because it was [her] work." Draper then "pushed" her so that she was "laying flat on [her] back," after which he pulled her jeans down and had sexual intercourse with her. Helen "just froze" and "just laid there" and cried during the encounter. After Draper was done, he "got up, pulled his pants back up[,] . . . buckled his belt and said, 'I have to leave now.'"

¶7     Helen continued dating Draper after the incident in the chiropractor's office, and she also continued having consensual sex with him. But another nonconsensual encounter happened a couple of months later while the two were alone at Draper's house. Helen "was sitting on the arm of the couch in his living room" when "he pushed [her] down onto the couch, so [she] was laying on [her] back." Helen didn't really understand what he was doing and "curled up into a ball in the fetal position." At that point, Draper "grabbed [her] knees, pulled them back over the arm of the couch, and pulled [her] pants down and held [her] legs down." Helen started "wiggling back and forth and trying to get out from under him," telling Draper that she didn't want to have sex "because at any moment any of his family members could walk into the house." Despite her protests, Draper proceeded to have sexual intercourse with her.

¶8     At trial, Helen did not offer much detail about how their relationship progressed after this incident, but she did say that the two broke up in "the spring of 2017."

¶9     **Tori.** Tori met Draper in July 2017. Tori was from the nearby town of Blanding, and Draper would often "sneak out" with other friends and meet her there. This went on for a few weeks, and Tori later said that, on these occasions, the two would "make out" and sometimes touch each other's genitals. But Tori also said that she was "very clear" with Draper that she "did not want to have sex" with him until she "was over 18" and that she had told Draper this "multiple times." Tori later testified that on one particular occasion, Draper had sexual intercourse with her even though she "told him no." Tori claimed that after Draper finished, she told him that "it was wrong" and that she "didn't like that he had done that." She said that in response, Draper told her that "he was sorry." Tori said that their relationship ended a short time later. The jury acquitted Draper of the rape charge that was based on this allegation.

¶10    **Nora.** Nora met Draper in October 2017, shortly after she moved to Monticello with her family. The two started out as friends, but by November or December of 2018, they were a couple. At that time, Nora was a junior in high school. Draper was attending college elsewhere in the state, but he would return to Monticello "every weekend." As their relationship progressed, the two became "more touchy." They would "make out" and Draper would sometimes "try to grab" Nora's "boobs" and "butt." According to Nora, Draper "started to kind of push . . . how far he could go" until Nora "would say . . . stop."

¶11    Nora later claimed that Draper had nonconsensual sex with her on two occasions, and Draper was charged with two counts of rape, one based on each alleged incident. The jury acquitted Draper on the allegation relating to the first incident, but it convicted him on the second.

¶12    The first incident occurred in December 2018. According to Nora's testimony at trial, Nora and Draper were watching a show in his basement and began kissing. Nora said that Draper tried to take her pants off but that she resisted. Nora said that the two eventually ended up in a spare bedroom and engaged in some "grinding." But Nora said that she repeatedly told Draper that she didn't want to have sexual intercourse and that Draper repeatedly assured her that they wouldn't. According to Nora, however, she then felt "penetration." When Nora told him, "I don't want to do this," Draper told her that it wasn't actually sex but was instead "docking." Nora later explained that she was naïve as to the specifics of sex so she was inclined to trust him. She also later testified that she didn't "remember much" about what happened during the remainder of this encounter but that she did "remember just crying."[3]

---

3. At trial a few years later, Nora expressed her understanding that the term "docking" can refer to a situation in which the "penis

(continued…)

¶13   The second incident (which resulted in a conviction) occurred in March 2019. On the night in question, Nora and Draper decided to take a late-night drive to a restaurant in Moab. On the drive, Nora "was leaning on his arm" and "occasionally kissing his cheek." At some point, Draper "took that as an invitation" and pulled over to the side of the road. Draper then moved over to Nora's side of the car and proceeded to hold her hands down and take off her pants. Nora responded by "fighting him," "hitting him in the face," and "saying, 'Stop. I don't want to do this right now.'" But Draper persisted, managed to get his pants off and her pants down below her knees, and then began "penetrating" her while "holding [her] hands down." Nora continued to fight back and was able to hit Draper in the head and face. Nora later testified that "[h]is face would change in this way where he couldn't hear" and that it "seem[ed] liked he just didn't care." Nora could not later recall if Draper "finished" or instead "just snapped back to reality," but regardless, she said that the incident left her scared and wanting to immediately go home.

¶14   Around June 2019, the two broke up. After their relationship ended, Nora told her sister what Draper had done to her. She also told the father of one of her friends, who suggested that Nora go to a victim advocate resource center (the Center). Nora did, and she later testified that this was the first professional help that she sought out.

¶15   **Diane.** Diane became close friends with Draper at the end of 2019 while she was a junior in high school and Draper was in college. By that time, some of the details about Nora and Draper's relationship had become public knowledge—including Nora's claim that Draper had raped her. Diane took it upon herself to "stand up for [Draper] when other people said negative things about him," and she also began to talk "a lot of crap" about Nora.

---

enters a vagina just one time." Nora also testified that while she initially thought this didn't count as sex, she later came to believe that "docking and sex were the same thing."

Though Diane and Draper talked or communicated through texts or electronic apps "probably almost every day," Diane later said that she never had any romantic interest in Draper.

¶16 In March 2020, Diane was "hanging out with some friends" one night at Lloyds Lake near Monticello when Draper reached out about getting together. Draper soon joined the group at the lake, after which he offered Diane a chance to drive his truck. Since Diane was too short to see over the dash, she sat on Draper's lap to steer. The two drove on some nearby gravel roads for a while, but while heading back to the group, Draper "reached over and took control of the truck," taking them down the hill away from the group to a nearby pavilion. They stayed in the truck and talked for a minute, but then Draper "just kind of . . . changed, like he wasn't [himself] anymore"—almost as if he was "possessed."

¶17 According to Diane's testimony at trial,

> [T]hat's when he like reached over and grabbed my throat and used it as like leverage to put me in the backseat of his truck. And I don't really know, like can't really explain like how he put me in the backseat because I was like freaking out. . . .
>
> And when he got in the backseat of the truck he got back there like with his hand still on my throat. . . . And then he pulled my shorts over and put his penis inside my vagina. And I was like screaming and yelling at him, like, "Tyler, like, no. What are you doing?" Like, screaming no over and over again. Like, "You're stupid." I was slapping him. I was screaming. I was crying. Like, "Tyler, stop. Like, you're dumb. Like, no. Like, seriously, it's not funny anymore. Stop." Like no, like over and over again until I just like, I froze. Like, I just couldn't scream anymore. And he was like throwing me around like a rag doll.

Diane said this continued for "10-ish, 15 minutes," after which Draper eventually stopped. Diane knew that Draper had ejaculated at some point because she remembered that her shorts got wet when she sat in something she believed to be semen. Diane said that she then crawled into the front seat, ignoring Draper as he drove the truck back to the group. When they arrived, Diane asked a friend to take her home. This incident would later form the basis of one of the rape charges as well as an aggravated assault charge. The jury convicted Draper on the rape charge but acquitted on the aggravated assault charge.

¶18    About two months after the encounter at the lake, Diane reached out to Nora—the same classmate that Diane had relentlessly "bullied" earlier for accusing Draper of rape. Diane later testified that although it was difficult to contact Nora, her encounter with Draper had traumatized her and negatively impacted her mental health, and Diane believed that Nora could "help" Diane "get the help [she] needed." After Diane reached out, Nora referred Diane to the Center. Diane later spoke with law enforcement as well.

*Draper Waives His Preliminary Hearing*

¶19    In June 2020, Draper was charged with rape and aggravated assault based on Diane's allegations. The following month, additional charges were added based on the allegations from Helen, Tori, and Nora.

¶20    In the early stages of the case, the COVID-19 pandemic was causing disruptions to court schedules. At a hearing, Draper's attorney (Counsel)[4] expressed the concern that, given the number of counts and witnesses, a preliminary hearing would be difficult

---

4. Draper was represented by two attorneys throughout the proceedings below. For simplicity, we'll refer to them collectively as Counsel, even if certain statements or actions we're describing were attributable to only one of them.

to schedule and carry out, possibly leading to a delay in getting to trial. To avoid these problems, attorneys from both sides suggested to the district court that, in lieu of holding a formal preliminary hearing, the defense would be allowed to interview the witnesses off the record (and not on the court's time). The attorneys suggested that Draper would agree to a "conditional waiver" of the preliminary hearing in the meantime, and they asked the court to schedule an arraignment a few weeks out, with the understanding that Draper could "change [his] mind" and request a preliminary hearing before entering a plea. Counsel acknowledged to the court that this was a "unique procedure," but she then said, "I think it's best, with COVID and the number of counts, and the number of witnesses." Addressing Draper directly, the court reminded him that he had a right to a preliminary hearing and asked whether he agreed to "conditionally" waive it. Draper responded that, on the advice of Counsel, he would do so.

¶21   From the available record, it appears that the parties originally intended to allow Draper to participate in the off-the-record interviews through "video communication." For reasons that are a bit unclear (but which seem to have been technical in nature), Draper was not able to participate in those interviews. There is also some indication that Draper had understood that these interviews would be recorded. But for reasons that are again unclear from the record, they were not.

¶22   A few months later, Draper appeared for the scheduled arraignment. At that hearing, the court expressed its willingness to continue the case again if Draper needed more time for the witness interviews, but both sides agreed that the interviews had already been conducted and that it was appropriate to formalize the waiver of the preliminary hearing and proceed with the arraignment. Before that occurred, Counsel addressed Draper directly and made a record of what had occurred so that Draper would "know[] exactly" what was happening. Counsel noted that Draper had not been able to "participate in the interviews."

Counsel then explained that the defense attorneys had been able to "interview the State's witnesses, through Zoom interviews, rather than do that by a formal preliminary hearing." Counsel said that both of the defense attorneys "took notes." And Counsel pointed out that this procedure gave the defense attorneys "more leeway in questioning the individuals" and that they were able to "take as much time as [they] needed." With that understanding, Counsel suggested to Draper and the court that it was now appropriate to "waive the preliminary hearing" and proceed with the arraignment. Draper did not object.

¶23   After Counsel made this record, the court addressed Draper directly and asked him to enter pleas to each of the charges. Draper pleaded not guilty to each charge.

*Pretrial Motions*

¶24   The parties filed a number of pretrial motions. Two of them are particularly relevant for purposes of this appeal.

¶25   **Victim Advocate Subpoena.** Counsel issued a subpoena to a victim advocate (Victim Advocate) from the Center who had met with some of the victims after they came forward with their allegations. The subpoena ordered Victim Advocate to appear and testify at the upcoming trial, as well as to produce certain written materials from the Center.

¶26   The Center filed a motion to quash the subpoena. There, the Center described itself as a "rape crisis center," and it argued that it qualified as a "victim advocate" for purposes of Utah law, meaning that any communications between its staff and any victims were privileged under rule 512 of the Utah Rules of Evidence. The Center further argued that the requested information was likewise privileged and protected under various other state and federal laws. Indeed, in the Center's view, it could not "even acknowledge that any individual [was] a recipient of services."

¶27    Counsel did not file a written response to the motion to quash, but Counsel did oppose it orally on the first day of trial. There, Counsel argued that the communications in question were not "confidential" because there were indications that some combination of victims had met with Victim Advocate as a group. Counsel further noted that rule 512 has an exception to the privilege for "exculpatory" information, and Counsel argued that this exception applied because the defense theory involved a "solicitation of witnesses" and collusion defense, and testimony from Victim Advocate would therefore be relevant to defense arguments about the victims' "motive[s]" and "credibility."

¶28    After arguments, the court ruled from the bench, stating that the Center "does have a privilege, and it's a privilege that's authorized by both state and federal law." The court then ruled that it was "unaware of any exception to the privilege" that would apply in this case, so it accordingly granted the motion to quash the subpoena of Victim Advocate. But the court then recognized that "victim credibility [was] very much at issue" in this case, so it said that in cross-examination of witnesses (including the victims), it would allow Counsel to "delve quite extensively into" how the victims were questioned and who was in the room with them during their various interviews. The court further encouraged the parties to "come up amongst [them]selves" with a means of referring to the Center and Victim Advocate without mentioning their names.

¶29    **Notice of Intent to Call Expert Witness.** Counsel filed a notice of intent to call an expert witness (Expert) to testify about interview protocols at the Children's Justice Center (CJC), as well as "SANE" examinations and "Code R" reports.[5] Counsel later

---

5. The Children's Justice Center provides services when "a serious crime has occurred to a child or teenager," and these services often include a trauma-informed interview. *Children's Justice Center*, Salt Lake County Dist. Att'y, https://www.saltlakecounty.

(continued…)

explained that Expert had a background as a "special victim's detective" and would be able "to educate the jury on the standards and practices of interviewing sexual assault victims." In the notice, Counsel asserted that the victims were interviewed "numerous times," and, on at least one occasion, some victims had been "interviewed together," and that from this, Expert should be able to testify that these "deviation[s] of procedure could impact the reliability of the witness testimony." In the notice, Counsel further asserted that Expert should be able to testify that the lack of SANE examinations and Code-R reports showed the "lack of independent physical examinations."

¶30   The State filed a written memorandum opposing the proposed testimony on several grounds. First, the State argued that testimony about CJC interview protocols would be irrelevant because the State intended to put on all of the witnesses in question for direct testimony. Second, the State argued that the proposed testimony about Code-R reports and SANE examinations would be irrelevant and might confuse the jury "due to the nature of the reporting by the victims in this case." Third, the State argued that Expert's proposed testimony would be inadmissible under rule 403 of the Utah Rules of Evidence. In the State's view, the proposed testimony was "completely void of any probative value" and the defense's arguments "regarding veracity and credibility" could "be properly explored through cross examination." Finally, the State argued that adding expert

gov/district-attorney/childrens-justice-center/ [https://perma.cc/B 2C2-59F8].

A "'code-R' or rape kit procedure" is sometimes done after an alleged victim of sexual assault makes a report of the sexual assault, and it "involves 'a full body examination, swabs, photographs and collection of clothing or other items,' and is typically performed by a 'sexual assault nurse examiner (SANE).'" *In re A.S.G.-R.*, 2023 UT App 126, ¶ 6 n.2, 538 P.3d 1259.

testimony about "the credibility of a witness" would "invade[] the jury's exclusive right to judge credibility."

¶31 After hearing arguments about this on the first day of trial, the court limited the potential testimony of Expert. The court first ruled that Expert could not testify about CJC interview protocols because the State was not relying on any CJC interviews in its case. The court likewise ruled that Expert could not testify about the SANE examinations or Code-R reports because the State was not presenting such evidence either. But the court then ruled that it would permit Expert to "describe for the jury best practices for law enforcement interviewing" "and maybe even point out where some best practices weren't followed." But the court cautioned that Expert's testimony should in no way encroach on "the jury's decision-making process about veracity," and the court further expressed its view that "the jury understands that idea of meddling" or "coaching" even without expert testimony.

### Trial and Sentencing

¶32 The trial took place over four days. Each of the four victims testified and were cross-examined, thus detailing the incidents described above. During the defense's case, Counsel called a police officer who testified that Diane's shorts had been examined and that investigators found no traces of seminal fluid. The defense also called Draper's mother and one of Diane's classmates from high school, each of whom testified about Diane's potential motives for alleging rape. Although the court had ruled that it would allow Expert to offer limited testimony about law enforcement interview protocols, Counsel did not call Expert to testify. During closing arguments, Counsel argued that Helen, Tori, and Nora were lying about their lack of consent to sex because of regret or shame, and Counsel further argued that Diane was lying about the alleged incident because of unrequited love.

¶33 At the close of trial, the jury convicted Draper on four counts of rape: two counts involving Helen (based on the

encounters in the chiropractor's office and Draper's living room); one count involving Nora (based on the encounter in the car on the way to Moab); and one count involving Diane (based on the encounter in Draper's truck at the lake). But the jury found Draper not guilty on three charges: the rape charge stemming from Tori's allegations; the rape charge stemming from the incident between Nora and Draper that involved "docking"; and the aggravated assault charge stemming from the incident with Diane. At sentencing, the court ordered Draper to serve consecutive prison sentences for the four rape convictions.

## ISSUES AND STANDARDS OF REVIEW

¶34   On appeal, Draper first raises a series of challenges to the district court's conclusion that communications between Victim Advocate and the victims were privileged. "The existence of a privilege is a question of law for the court, which we review for correctness, giving no deference to the trial court's determination." *Staley v. Northern Utah Healthcare Corp.*, 2010 UT 19, ¶ 9, 230 P.3d 1007 (quotation simplified).

¶35   Second, Draper raises several challenges to the district court's decision to limit Expert's testimony. "The correct standard of review for a trial court's decision to admit or exclude expert witness testimony is abuse of discretion." *State v. Suhail*, 2023 UT App 15, ¶ 70, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023).

¶36   Third, Draper argues that, as a result of the district court's various evidentiary rulings, he was denied his constitutional right to present a complete defense. "Constitutional issues are questions of law that we review for correctness." *State v. Richardson*, 2009 UT App 40, ¶ 5, 204 P.3d 872 (quotation simplified).

¶37   In conjunction with some of the above issues, Draper also argues that Counsel was ineffective in various respects. "When a

claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Amboh*, 2023 UT App 150, ¶ 16, 541 P.3d 299 (quotation simplified).

¶38 Draper also acknowledges in his opening brief that there might be some question as to whether some of the above issues were preserved. Draper thus alternatively asks us to conclude that any unpreserved claims constituted plain error. "To prevail on plain error review, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Cesspooch*, 2024 UT App 15, ¶ 7, 544 P.3d 1046 (quotation simplified), *cert. denied*, 550 P.3d 994 (Utah 2024).

¶39 Finally, alongside his opening brief, Draper filed a motion for a remand based on rule 23B of the Utah Rules of Appellate Procedure. A rule 23B remand is "available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

ANALYSIS

I. Victim Advocate Privilege

¶40 Under rule 512 of the Utah Rules of Evidence, a "victim communicating with a victim advocate has a privilege during the victim's life to refuse to disclose and to prevent any other person from disclosing a confidential communication." Utah R. Evid. 512(b). But the rule contains several exceptions under which the privilege does not apply. *Id.* R. 512(e). And one set of exceptions applies when an alleged victim's communications are made with a "criminal justice system victim advocate." *Id.* R. 512(e)(1)(E). Below, the district court ruled that the privilege applied and that

the proposed exceptions did not apply, and it thus quashed the subpoena that sought testimony from Victim Advocate.[6]

¶41  On appeal, Draper challenges the district court's rulings on several grounds. In brief, he argues that: (i) the communications were not "confidential" because multiple people were present in at least some of the meetings; (ii) the Center qualified as a "criminal justice system victim advocate" and that certain exceptions to the privilege applied; (iii) the court misapplied federal law in support of its conclusion that the communications were privileged; and (iv) the privilege belongs to, and must be asserted by, the victims themselves, and the Center therefore should not have been permitted to file the motion to quash. Finally, Draper also argues that Counsel was ineffective for not arguing that any privilege had been waived on these and various other grounds.

¶42  As an initial matter, the State asserts that some of the issues raised by Draper were unpreserved. Draper disagrees. But we need not resolve this disagreement. This is so because, under settled authority, "if the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." *State*

---

6. Rule 512 was originally created through a legislative enactment that took effect in July 2019. *See* H.R.J. Res. 3, 63d Leg., Gen. Sess., 2019 Utah Laws 3660 (effective July 31, 2019). The rule was amended by the supreme court in May 2022, but those amendments do not change the provisions we cite.

Also, we note that the subpoena at issue sought to compel both testimony from Victim Advocate and the production of records. On appeal, Draper's arguments are focused on the potential testimony alone, so we'll follow suit. Regardless, to the extent that Draper's arguments implicate the records as well, our resolution applies with equal force.

*v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 (emphasis omitted). We choose to do so here.

¶43    Draper does not assert that any of the above issues constitute structural errors—i.e., the kind of error for which a defendant need not establish prejudice. *See State v. Reece*, 2015 UT 45, ¶ 34, 349 P.3d 712. As a result, even if any of the above issues were preserved, Draper can only prevail if he establishes both the existence of an error and that he was prejudiced. *See State v. Collins*, 2014 UT 61, ¶ 28, 342 P.3d 789 ("[T]he general rule is that all errors are reviewed for harmlessness."). Draper has the burden of establishing prejudice. *See State v. Leech*, 2020 UT App 116, ¶ 43 n.7, 473 P.3d 218 ("Except in cases of constitutional error, Utah law places the burden on the defendant to prove that a preserved error is harmful."). Draper likewise has the burden to establish prejudice with respect to his claims of plain error or ineffective assistance of counsel. *See State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (plain error); *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (ineffective assistance).

¶44    The "showing of prejudice required to establish that preserved errors are harmful is indistinguishable from the showing of prejudice required to establish plain error or ineffective assistance of counsel for unpreserved errors." *Leech*, 2020 UT App 116, ¶ 43 n.7. To prevail under any such claim, Draper must show that there is a reasonable likelihood that he would have received a more favorable outcome below without the alleged error, thereby undermining our confidence in the verdict. *See, e.g., Reece*, 2015 UT 45, ¶ 33 (prejudice standard for preserved claims); *State v. Popp*, 2019 UT App 173, ¶ 36, 453 P.3d 657 (prejudice standard for plain error review); *State v. Miller*, 2023 UT App 85, ¶ 27, 535 P.3d 390 (prejudice standard for an ineffective assistance claim). And here, Draper's claims of prejudice regarding the privilege issues are all premised on the assertion that Victim Advocate's testimony would have helped him "discredit[]" the victims. In Draper's view, Victim Advocate's testimony would have shown that the victims' accounts were

"taint[ed]" because of prior "communication between [them]," as well as because of Victim Advocate's "potential influence on them."

¶45    In general, this court is "more likely to reverse a jury verdict if the pivotal issue at trial was credibility of the witnesses and the errors went to that central issue." *Leech*, 2020 UT App 116, ¶ 44 (quotation simplified). And we recognize that this case did indeed turn in large measure on the credibility of the victims— i.e., there was no physical proof demonstrating that Draper had nonconsensual sex with any of his accusers. And we further take Draper's point that because the jury acquitted him on some of the charges it follows that the jury at least had some question about some of the accounts, either on factual or legal sufficiency grounds. But even so, we conclude that Draper has not carried his burden of showing that, if Victim Advocate had testified, there's a reasonable likelihood that the jury would have been persuaded to acquit him on any of the additional counts. This is so for several interrelated reasons.

¶46    First, we've previously held that if proposed additional evidence would have been "merely cumulative of the evidence" that the jury already heard, we're less likely to conclude that the defendant was prejudiced. *State v. King*, 2012 UT App 203, ¶ 34, 283 P.3d 980. Here, much of Draper's prejudice claim turns on the possibility that Victim Advocate could have testified that the victims were communicating with each other—both in general and regarding their allegations, and sometimes with Victim Advocate as the nexus point.

¶47    But as a starting point, the jury already heard that the victims were communicating with each other. Here are just a few of the examples:

- Helen testified that after her relationship with Draper ended, she often texted "other girls"—including, of note,

Nora— to "vouch for or talk up" Draper, and that she did so at his prompting.

- During Tori's cross examination, Tori affirmed that she and Diane had been friends for "quite a few years." Tori testified that she knew Nora "a little bit" through their mutual connection with Draper. Tori also testified that after her allegations came to light, Nora reached out and asked "if [she] needed to talk about anything," and she said that the two had then "talked . . . a few times" about "the situation that's going on."

- Diane testified that she knew Nora through school because they were on the same cheerleading team. Diane further testified that after she decided to come forward with her allegations against Draper, she turned to Nora because Diane thought Nora "could help [her] get the help [she] needed" and help her "go forward to the authorities."

In these and other instances, the jury heard about the social connections among many of the victims. And these connections would have likely come as no surprise to the jurors. After all, the victims were all teenagers from the same small community in rural Utah, and they were in some instances part of overlapping friend groups. Moreover, the jury also heard testimony from various witnesses (including a defense witness) that the rape allegations were a common topic of conversation at the high school. Diane, for example, agreed that the students at the high school were "talking about the allegations" and that the allegations were "a pretty big thing," and she further agreed that the allegations were "an ongoing topic" of conversation in the community. As a result, the victims didn't need the presence of an outsider (such as Victim Advocate) to facilitate communication among them. And Counsel was thus able to advance a communication-based collusion defense on the testimony that was offered.

¶48 Second, Draper's claim is more particularly focused on the possibility that Victim Advocate played a role in arranging communications among the victims about their rape allegations. But the jury already heard about this too. Again, in its ruling on the motion to quash, the district court said that although it would not allow Counsel to call Victim Advocate to testify or identify her or the Center by name in questions, the court would "allow [Counsel] to delve quite extensively" during questioning about the role that Victim Advocate might have played generally, and the court said that it would allow such questions because "victim credibility is very much at issue here."

¶49 As a result, at various places during trial, this did indeed come up, sometimes through direct questions from Counsel, and sometimes unprompted by the victims during their answers to questions. While cross-examining Tori, for example, Counsel asked, "How many times were you interviewed, besides [by law enforcement] on this incident?" Tori responded that she "probably just talked to the victim advocate about it just the once." Counsel then asked (likely in violation of the court's order), "Do you remember the victim advocate's name?" Tori responded by naming Victim Advocate outright. While cross-examining Nora, Counsel asked Nora to identify who "the first professional" was with whom she had discussed her allegations. Nora responded by identifying the Center by name, and she then said that she went to the Center at the suggestion of a friend's parent whom she had confided in. During Diane's direct examination, Diane read aloud a text from Nora in which Nora had suggested setting up a meeting with Victim Advocate (and in which Nora had named Victim Advocate). Then, during cross-examination, Counsel asked Diane several questions about her subsequent meeting with Victim Advocate (and Counsel used Victim Advocate's name while doing so), including questions about who drove Diane to that appointment and who else was in the room when Diane met with Victim Advocate.

¶50     From these and other answers, the jury therefore already heard that some of the victims had met with Victim Advocate, and the jury likewise heard that certain victims, in some instances, were connecting other victims to Victim Advocate as well.

¶51     Third, if she had testified, Victim Advocate could certainly have given more testimony about her interactions with the victims. But to show prejudice, Draper must show that it's reasonably likely that this missing testimony would have helped his cause. And because our "power of review is strictly limited to the record presented on appeal," *Diversified Striping Sys. Inc. v. Kraus*, 2022 UT App 91, ¶ 67 n.12, 516 P.3d 306 (quotation simplified), our consideration of this question in the direct appeal must be based on what's in the appellate record, *see In re A.H.*, 2024 UT 26, ¶ 45, 554 P.3d 969 ("It is well established that an appellate court will not consider evidence which is not part of the record" (quotation simplified)).

¶52     Here, Draper has not pointed us to anything in the record showing that Victim Advocate would have said anything that would have supported his collusion-based defense—at least not to a degree that makes it reasonably likely that Draper would have received a more favorable outcome at trial. During arguments on the motion to quash, Counsel suggested that Victim Advocate was "everywhere"—"with them in the family's home," "with them at the school," and "with them in other witness's homes." Counsel also stated that she thought Victim Advocate had been "soliciting witnesses," and she proffered that Victim Advocate had told one victim that she didn't "have a choice" and that she had "to report [an incident] to police."

¶53     But even if Victim Advocate had testified to these things, this testimony would in some sense have been cumulative. Again, the jury already heard that Victim Advocate was actively meeting with some of the victims. And beyond that, this evidence does not go as far as Draper suggests. Of some note, the evidence suggested that not all of the victims met with Victim Advocate.

For example, there is no testimony indicating that Helen ever met with Victim Advocate, and yet she was the victim for two of the four rape charges that resulted in convictions. And Tori testified that she spoke with Victim Advocate "just the once."

¶54 Moreover, the evidence also showed that, before meeting with Victim Advocate, several of the victims had already discussed their allegations against Draper with other people. For example, Diane testified that Nora helped connect her with Victim Advocate, but she said that this happened *after* she had approached Nora and asked Nora to "help" her "get the help [she] needed." This would have suggested that, although Victim Advocate may have later connected Diane with law enforcement, Diane had already told friends and family by this point that Draper had raped her, thus undermining the suggestion that her allegation was a false allegation that was prompted by suggestion from Victim Advocate.

¶55 And that's largely why we see no reasonable probability that Victim Advocate's proposed testimony would have mattered. What little evidence there is in the record about all this suggests that Victim Advocate and the Center were engaged in victim advocacy services—services that are apparently common enough and accepted enough to warrant a dedicated rule of evidence that creates a privilege. Because of this, the mere fact that Victim Advocate may have met with victims wouldn't by itself suggest that Victim Advocate had facilitated any improper collusion. Were that enough to allow a court to compel testimony, the privilege would effectively be a nullity.

¶56 But the defense in question turned on the notion that Victim Advocate's role had somehow prompted *false* testimony, and there's simply no indication in the record suggesting that, if she had been called, Victim Advocate would have said anything to support that. Instead, while Victim Advocate may well have added additional details about things the jury already knew (i.e., that some of the victims had met with her), the record indicates

that many of the victims were already speaking about the incidents to each other and to other friends and family. Draper has not pointed to anything in the record showing that Victim Advocate would have said that she spoke with anyone who had not already told someone else that Draper had sexually assaulted her. Nor has he pointed to anything from which we could credibly surmise that Victim Advocate would have said that she encouraged anyone to testify falsely. As a result, even with the proffer from Counsel (which, of course, must be viewed alongside the other testimony offered by the victims at trial), it seems just as likely (if not more so) that, had she testified, Victim Advocate's testimony would have *supported* the victims' claims, as opposed to undermining them.

¶57 Finally, we also note that the State filed a notice, pursuant to rule 404(b) of the Utah Rules of Evidence, that it had another witness who was also accusing Draper of rape and aggravated sexual assault. As opposed to Helen, Tori, Nora, and Diane, each of whom came from the same small town (or, in the case of Tori, a nearby community), this additional witness was from a different county and had no apparent involvement with the Center or Victim Advocate.

¶58 The State did not ultimately call this witness. But if the district court had allowed Draper to call Victim Advocate and ask her additional questions about her involvement with the victims, the record shows that the State could have responded by offering this testimony from yet another young woman who was asserting that Draper raped her. And because she apparently had nothing to do with the other victims or the Center, her testimony would have been untainted by the alleged collusion involving Victim Advocate. This, too, undermines the suggestion that Draper would have obtained a more favorable outcome if the court had permitted him to call Victim Advocate.

¶59 In short, the jury already heard that many of the victims knew each other, that many of the victims had communicated

with each other about their allegations against Draper, and that several of the victims had discussed their allegations with Victim Advocate. And yet even having heard all this, the jury convicted Draper of four counts of rape anyway. While Draper asserts that he should have been allowed to question Victim Advocate about her interactions with the victims, nothing in the record persuades us that Victim Advocate would have said anything that would favor the defense, much less that there's a reasonable likelihood that it would have been so favorable that Draper would have obtained a more favorable verdict as a result. We thus reject Draper's claims regarding the privilege for a lack of prejudice.[7]

---

7. In passing, Draper asserts in his brief that the silence in the record should not be held against him because the district court's ruling on the privilege issue effectively prevented him from creating a record sufficient to establish prejudice. While we're sensitive to the concern, Draper hasn't meaningfully briefed, much less provided any supportive authority, for the proposition that a defendant in this kind of scenario need not establish prejudice. His claim fails for this reason alone.

In any event, we also note that in such scenarios, a defendant could in theory still create such a record—whether it be through a specific proffer or instead by pointing to evidence that is in the record that supports a reasonable inference that the missing testimony would have been defense-favorable. But as explained, we see no such evidence in this record, particularly evidence that would overcome the testimony offered at trial that runs to the contrary. Finally, even if such evidence simply does not exist, rule 23B provides a mechanism by which an appellate court may "grant criminal defendants a limited remand of their case to the trial court so the record may be developed on an ineffective assistance of counsel claim." *State v. Goodall*, 2024 UT App 100, ¶ 27, 554 P.3d 1155, *petition for cert. filed*, Sept. 18, 2024 (No. 20241000). But in his rule 23B motion, Draper did not proffer that he had any evidence showing that Victim Advocate's

(continued…)

## II. Expert Testimony

¶60 A "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). The "correct standard of review for a trial court's decision to admit or exclude expert witness testimony is abuse of discretion." *State v. Suhail*, 2023 UT App 15, ¶ 70, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023). "Under this standard, we will not reverse unless the decision exceeds the limits of reasonability." *State v. Kufrin*, 2024 UT App 86, ¶ 34, 551 P.3d 416 (quotation simplified). "An abuse of discretion occurs only if it can be said that no reasonable person would take the view adopted by the district court." *State v. Edwards*, 2023 UT App 23, ¶ 15, 527 P.3d 826 (quotation simplified).

¶61 As noted, the district court imposed certain limitations on Expert's ability to testify about the possibility that the victims' accounts were tainted by improper interview practices. Draper raises several challenges to those limitations. Broadly speaking, Draper's arguments fall into three categories—one that's general, and two that are specific. We address each in turn.

¶62 First, Draper asked the court to allow Expert to testify about the possibility that the victims' testimonies had been tainted by improper or excessive pretrial interviews. But the court rejected that testimony, expressing its view that the jury did not need expert testimony to understand the potential problems of victims being influenced if they heard similar stories from other victims or from the interviewers during interviews. In the court's

---

testimony would have supported a collusion defense, nor did he seek a remand to establish an ineffective assistance claim linked to such an assertion.

view, "that's something the jury inherently would understand" because "everyone has experienced that in some degree." In other words, the court believed that "that type of influence and that type of thing . . . is inherently understandable to a jury in judging credibility." Draper challenges that conclusion on appeal, arguing that the "issue of taint is not one within the common knowledge of an average juror."

¶63   As an initial matter, we agree with Draper that expert testimony can sometimes be admitted to address certain kinds of problems with witness testimony. In *State v. Perea*, for example, our supreme court held that it was an abuse of discretion to prevent expert testimony on "the phenomenon of false confessions." 2013 UT 68, ¶ 71, 322 P.3d 624. And in *State v. Clopten*, our supreme court permitted expert testimony that would help juries "recognize potential problems with eyewitness testimony" (though it stopped short of "adopt[ing] an outright presumption" of admissibility). 2009 UT 84, ¶¶ 25, 49, 223 P.3d 1103.

¶64   But even so, as indicated, our cases still hold that a district court generally retains discretion whether to permit expert testimony in a given case. Because of this, situations in which appellate courts have held that a district court was *required* to permit expert testimony have been somewhat rare. In *Perea*, for example, the supreme court was persuaded that expert testimony relating to false confessions should have been admitted because of extensive "research" showing "that the potential infirmities of confessions are largely unknown to jurors." 2013 UT 68, ¶¶ 68, 71. But the court still acknowledged that "expert testimony regarding the phenomenon of false confessions would not be appropriate in every case," especially where the common indicators of a false confession are not present. *Id.* ¶ 70.

¶65   Here, Draper has not pointed to any research showing that, without expert assistance, juries are unequipped to understand whether a witness's account could have been tainted by improper

interview techniques. Draper has not shown that he was unable to explore these topics with the victims during his cross-examinations of them. And Draper points to no cases holding that a district court *must* allow expert testimony on the possibility that a witness's testimony could have been tainted by improper interview techniques.

¶66    In light of all this, we see no basis for imposing such a requirement now. Our supreme court has long held that when assessing the "helpfulness" of evidence under rule 702, "the trial court must first decide whether the subject is within the knowledge or experience of the average individual." *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993). "Under this rule, no expert testimony is *required* if the matter at issue in the case is one which is within the knowledge of the average trier of fact, or if the other evidence is such as to present the issues in terms which the jury can be expected to understand." *State v. Payne*, 964 P.2d 327, 332 (Utah Ct. App. 1998) (emphasis added, quotation otherwise simplified).

¶67    As indicated, the district court observed that, in its view, jurors could understand the possibility of improper tainting without expert assistance. As also indicated, this kind of assessment falls within the district court's discretionary authority. And again, "an abuse of discretion occurs only if it can be said that no reasonable person would take the view adopted by the district court." *Edwards*, 2023 UT App 23, ¶ 15 (quotation simplified). On this record, we cannot say that this decision was so unreasonable that it constituted an abuse of discretion.

¶68    Second, the district court ruled that Expert could not testify about CJC interview protocols, and it did so largely because neither side intended to submit evidence from any CJC interview. Draper challenges this on appeal, asserting that the testimony should have been permitted because "at least one of the [victims] that was a minor at the time was interviewed multiple times at the CJC."

¶69 But by Draper's own account, only one of the four victims was interviewed at the CJC, and no party introduced any statements from that interview at trial. Thus, Draper is faulting the district court for not allowing him to present expert testimony about interview protocols for a particular kind of interview, even though the jury did not hear that this kind of interview ever took place. In these circumstances, we think the court could reasonably conclude that such testimony would have been irrelevant and potentially confusing to the jury. *See* Utah R. Evid. 403. The decision to exclude this testimony was comfortably within the court's discretion.

¶70 Third, the district court also ruled that Expert could not testify about either SANE examinations or Code-R reports, given that none of the victims had undergone a SANE examination and there were no Code-R reports. Alongside his arguments about the taint issues, Draper challenges these rulings too. But we again see no abuse of discretion.

¶71 As indicated above, when an alleged victim comes forward to report an alleged sexual assault shortly after it has occurred, the victim is often examined by a trained nurse—referred to as a SANE (i.e., a Sexual Assault Nurse Examiner)—and the resultant Code-R report details any observations or evidence that the nurse collected during the exam. *See supra* note 5. But none of the victims in this case reported the rapes shortly after the sexual encounters, so as a result, there were no SANE examinations or Code-R reports at all.

¶72 Draper nevertheless asserts that Expert should have been allowed to testify about the "lack of corroborating physical evidence." But the district court could reasonably conclude that a jury didn't need expert testimony about the very specific subjects of SANE examinations and Code-R reports in order to understand that the victims had not come forward shortly after the rapes and that the State had not collected the kinds of physical evidence that it in theory could have collected if they had. The district court's

decision to disallow such testimony was eminently reasonable and was not an abuse of discretion.

## III. The Right to Present a Complete Defense

¶73 Draper's final argument on appeal is that the district court's evidentiary rulings prevented him from "present[ing] a complete defense" and "telling a plausible story," thus violating his rights under the Fourteenth and Sixth Amendments of the United States Constitution, as well as the Due Process Clause set forth in Article I, Section 7 of the Utah Constitution. But in the issues section of his opening brief, Draper acknowledged that "[t]his issue was not preserved," so he accordingly suggested that we should review this issue for ineffective assistance of counsel. We decline to do so.

¶74 Under the Utah Rules of Appellate Procedure, a party must provide this court with an "argument" that "explain[s], with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal." Utah R. App. P. 24(a)(8). These requirements are a "natural extension of an appellant's burden of persuasion." *State v. Roberts*, 2015 UT 24, ¶ 18, 345 P.3d 1226 (quotation simplified). And while there is not a "bright line" in this regard, *State v. Haar*, 2021 UT App 109, ¶ 52 n.8, 500 P.3d 102 (quotation simplified), the question of whether a party has done enough is one that's "left to the discretion of the appellate court," *Roberts*, 2015 UT 24, ¶ 18.

¶75 Draper's arguments are not sufficient. At the beginning of the Argument section of Draper's brief, he cited the familiar two-part test that governs ineffective assistance claims. But in the portion of his brief in which he argued that the court's evidentiary rulings violated his constitutional right to present a defense, he made no mention of the ineffective assistance doctrine or its two-part test. This must matter. After all, to prevail on an ineffective assistance claim, a defendant must show that trial counsel performed deficiently in some particular respect, and the

defendant must then show how that deficient performance prejudiced him. *See State v. Samora*, 2023 UT 5, ¶ 20, 529 P.3d 330.

¶76    This kind of analysis is claim-specific. In *Carrell v. State*, for example, we held that although a post-conviction petitioner had raised some ineffective assistance claims in a timely-filed original post-conviction petition, this didn't mean that the petitioner could later raise other ineffective assistance claims that were based on different facts or alleged legal errors without regard for the statute of limitations. 2023 UT App 93, ¶¶ 48–53, 536 P.3d 653, *cert. denied*, 540 P.3d 81 (Utah 2023). In this sense, we treated the different ineffective assistance claims as being distinct claims, and we did so because the general ineffective assistance standard was being applied to entirely different procedural and factual questions. *Id.* ¶ 52.

¶77    The same is true here with respect to the question of whether Draper sufficiently briefed this particular ineffective assistance claim. At minimum, Draper needed to argue and demonstrate in his opening brief that Counsel provided ineffective assistance by failing to assert that these evidentiary rulings violated these particular constitutional rights. In other words, to carry his burden of persuasion, Draper needed to present these constitutional claims through the lens of the ineffective assistance standard. Because he did not do so, we conclude that he has not carried his burden with respect to these claims.

## IV. Motion for a Rule 23B Remand

¶78    Under rule 23B(a) of the Utah Rules of Appellate Procedure,

> [a] party to an appeal in a criminal case may move
> the court to remand the case to the trial court for
> entry of findings of fact, necessary for the appellate
> court's determination of a claim of ineffective

assistance of counsel. The motion will be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective.

¶79 To obtain a remand under this rule, "a defendant must present the court with the evidence he intends to present on remand and explain how that evidence supports both prongs of the ineffective assistance of counsel test." *Suhail*, 2023 UT App 15, ¶ 126 (quotation simplified). If the proffered evidence and arguments do not "meet the test for ineffective assistance of counsel," "there is no reason to remand the case." *State v. Samples*, 2022 UT App 125, ¶ 57, 521 P.3d 526 (quotation simplified), *cert. denied*, 525 P.3d 1279 (Utah 2023); *see also State v. Miller*, 2023 UT App 85, ¶ 52, 535 P.3d 390 (explaining that "the alleged facts, if true, must establish both elements of a traditional ineffective-assistance claim" (quotation simplified)), *cert. denied*, 540 P.3d 78 (Utah 2023).

¶80 To prevail on an ineffective assistance claim, Draper must show that Counsel performed deficiently and that the deficient performance prejudiced him. *See Suhail*, 2023 UT App 15, ¶ 122. To establish deficient performance, Draper must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Forbush*, 2024 UT App 11, ¶ 25, 544 P.3d 1 (quotation simplified), *cert. denied*, 550 P.3d 995 (Utah 2024). The focus of this inquiry is reasonableness, and when "we judge the reasonableness of counsel's challenged conduct," we do so "viewed as of the time of counsel's conduct." *State v. Carter*, 2023 UT 18, ¶ 45, 535 P.3d 819 (quotation simplified). To establish prejudice, Draper "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Suhail*, 2023 UT App 15, ¶ 122 (quotation simplified). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address . . . either

prong" in our review. *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182; *see also State v. Meik*, 2024 UT App 46, ¶ 31, 547 P.3d 878 (recognizing that because a defendant "must establish both prongs," if "either is lacking, the claim fails and this court need not address the other" (quotation simplified)), *cert. denied*, 554 P.3d 923 (Utah 2024).

¶81 In his rule 23B motion, Draper requests a remand to create a record regarding a large number of proposed ineffective assistance claims. We'll address these requests in the following groups: first, we'll address a claim relating to text messages between Diane and Draper; second, we'll address several claims relating to an alleged lack of consultation between Counsel and Draper; and finally, we'll address several claims relating to Counsel's alleged failures to impeach witnesses.

A. Texts with Diane

¶82 At trial, Diane testified that she became close with Draper during her junior year of high school. She said they "hung out about almost every time he came down" to Monticello and that they communicated via text or app "almost every day." Diane also testified that she "[n]ever" had romantic interests in Draper. When Counsel asked Diane during cross-examination if there had "ever been any conversations between [her] and Mr. Draper that were sexual in nature," Diane responded, "Absolutely not."

¶83 In his rule 23B motion, Draper points out that, during discovery, Counsel obtained a large number of text messages that Draper and Diane had exchanged while they were friends. Draper then points to a subset of texts in which Draper and Diane discussed Diane's romantic and physical interests in boys she knew, none of whom were Draper. In those texts, the two also discussed some sexual matters. In his motion, Draper argues that Counsel was ineffective for failing to offer and then use these text

messages at trial. But we see no basis for ordering the requested remand.[8]

¶84 Rule 412 of the Utah Rules of Evidence "generally prohibits the admission of evidence of a victim's sexual behavior or sexual predisposition in any criminal proceeding involving alleged sexual misconduct." *State v. Bravo*, 2015 UT App 17, ¶ 11, 343 P.3d 306. Despite this general prohibition, Draper argues that these texts were admissible and should have been used for two particular purposes.

¶85 First, Draper claims that Counsel should have offered the texts as evidence that Diane had consented to have sex with him. In support, Draper points out that rule 412 contains several exceptions, one of which permits the admission of "evidence of

---

8. "Before admitting evidence" of a victim's sexual behavior or predisposition, "the [district] court must conduct an in camera hearing," and "[u]nless the court orders otherwise, the motion, related materials, and the record of the hearing are classified as protected." Utah R. Evid. 412(c)(3). In *State v. Rallison*, we recently recognized that "the rule does not address the handling of the evidence upon appeal." 2023 UT App 34, ¶ 5 n.2, 528 P.3d 1235. And we further noted that our decision about how much detail to include in an appellate decision should reflect the "purpose of rule 412," which "is to prevent the accusers in sexual assault cases from being subjected to unwarranted inquiries into their sexual behavior." *Id.* (quotation simplified).

In his rule 23B motion, Draper seeks to create a record about Counsel's failure to admit certain texts between himself and Diane that discussed some sexual matters. But because there was no request before the district court (and, thus, no in camera review), and because we conclude that Counsel was not ineffective for failing to introduce these texts, we conclude that the purposes of rule 412 are best served by keeping our description of these texts somewhat vague. We'll accordingly provide only enough detail to explain the basis for our decision.

specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent," so long as that "evidence is otherwise admissible" under the Utah Rules of Evidence. Utah R. Evid. 412(b)(2). But even if these texts could have been admitted under this exception—an issue that we need not and do not decide—we disagree with Draper's contention that Counsel performed deficiently by not offering them for this purpose.

¶86 When assessing whether counsel performed deficiently, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation simplified). "If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871.

¶87 The problem here is that if Counsel had used these texts to show that Diane consented to sex, this would have been contrary to the theory that Counsel ran regarding Diane at trial. At trial, Counsel argued that the instances of sexual contact involving Helen, Tori, and Nora were not rape because the encounters were consensual. But with respect to Diane, Counsel argued that this was "a whole different situation." Pointing to various alleged problems with Diane's account, Counsel argued the alleged sexual encounter never happened, and Counsel further asserted that Draper "was not interested in having sex" with Diane because he viewed her as a "little sister." Indeed, Draper has filed an affidavit in support of his rule 23B motion, and in that affidavit, Draper himself insists that he did not have sex with Diane.

¶88 As we've recently recognized, a defense attorney's "wide latitude to make tactical decisions surely include[s] the ability to protect the integrity of his preferred theory of the case by not simultaneously advancing a contradictory one." *State v. Rivera*, 2022 UT App 44, ¶ 41, 509 P.3d 257 (quotation simplified); *cf. State v. Pascual*, 804 P.2d 553, 556 (Utah Ct. App. 1991) (concluding that an "election between inconsistent defenses was a legitimate exercise of trial strategy rather than ineffective assistance of counsel"). Here, if Counsel had tried introducing the texts from Diane to show that she consented to sex with Draper, this could have undermined the defense's insistence that Draper regarded her as a "little sister" and did not have sex with her. The failure to offer these texts for this purpose was therefore not deficient performance.

¶89 Second, Draper also argues that Counsel could and should have introduced these texts to impeach Diane's testimony at trial that she'd never had "any conversations" with "Draper that were sexual in nature." While rule 412 does not contain a specific exception for impeachment, Draper argues that the texts would have been admissible for this purpose under rule 412(b)(3), which allows admission of evidence "whose exclusion would violate the defendant's constitutional rights." In Draper's view, his rights to confrontation and to present a complete defense would have allowed him to use these texts for impeachment.

¶90 The parties disagree about whether these texts would actually have been admissible under this rule. *See generally State v. Eddington*, 2023 UT App 19, ¶ 39 n.15, 525 P.3d 920 (discussing, but not deciding, the question of whether rule 412(b)(3) allows evidence of prior sexual conduct to be admitted for impeachment purposes). But we need not decide this question here. This is so because, even if these texts could have been admitted for this purpose, Counsel could have reasonably chosen not to use them.

¶91 We've reviewed the texts at issue. Without getting into the specifics, it's enough to point out that while Diane and Draper

texted about some sexual things, Draper points to no place in those texts (and we see none) where Diane ever texted Draper about having engaged or intending to engage in sexual activity *with him*.

¶92 This distinction matters because of the particular exchange at issue during trial. In the moments before the key question, Diane had been prompted to describe how she'd ended up sitting on Draper's lap while driving his truck that night. When Diane was asked whether she thought "it was odd to be sitting on his lap while [she] was driving," Diane said "no." When she was asked, "Why not?", Diane responded, "Because we were friends." It was in response to that question and answer that Diane was asked whether there had "ever been any conversations between [her] and Mr. Draper that were sexual in nature," to which Diane responded, "Absolutely not."

¶93 Against this backdrop, we agree with the State's assertion that Diane could have understood this question to be about whether she'd had conversations that were "sexual in nature" regarding sexual activity with Draper. After all, what had prompted that question was Diane's assertion that it was not weird for her to be sitting on Draper's lap because she and Draper were just friends. As a result, if Counsel had tried to impeach Diane by pointing to texts in which she'd discussed sexual things involving other people, Diane would have had an obvious response—she had understood the earlier question to be about sexual activity with Draper. Moreover, the impeachment value of this exchange would have been somewhat minimal anyway. This wouldn't have allowed Counsel to impeach Diane about her account of the alleged rape. Rather, it would have only allowed Counsel to impeach her about a decidedly peripheral issue (whether Diane and Draper had previously discussed sexual things over text). For this reason too, Counsel could have reasonably decided that this simply wasn't worth the distraction.

¶94 We thus disagree with Draper's assertion that Counsel performed in an objectively unreasonable manner by failing to pursue this potential line of impeachment, and we therefore deny this request for a remand.

B. Consultation Issues

¶95 Draper next asks for a remand so that he can create a record on several claims relating to Counsel's lack of consultation with him before trial. These requests are supported by affidavits from both Draper and his lead attorney.[9] We address each in turn.

1. Number of Meetings

¶96 In his affidavit, Draper states that he "only met with his attorneys twice before trial and these visits occurred within two weeks of trial." From this, Draper claims that Counsel was ineffective for not meeting with him often enough to prepare for trial. Even assuming that this allegation is true, we reject this request for a remand because Draper has not shown that Counsel performed deficiently.

¶97 In a criminal case, defense "counsel's function is to assist the defendant," and from this derives "the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of prosecution." *Strickland*, 466 U.S. at 688. But the deficient performance prong of an ineffective assistance analysis ultimately looks to "the reasonableness of counsel's challenged conduct"

---

9. As noted, Draper was represented by two attorneys below, and for simplicity, we've referred to them collectively by the singular "Counsel" throughout this opinion. The affidavit that was filed in support of Draper's rule 23B motion was provided by the attorney who appears to have acted as Draper's lead attorney. Since her affidavit informs our assessment of many of the rule 23B issues moving forward, we'll refer to her as "Lead Counsel" when discussing assertions she made in that affidavit.

when "viewed as of the time of counsel's conduct." *Carter*, 2023 UT 18, ¶ 45 (quotation simplified). In *Strickland*, the Supreme Court expressed its concern that the "availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges," and the Court cautioned lower courts against imposing "rigid requirements for acceptable assistance." 466 U.S. at 690. More saliently here, we have declined "to determine what amount of time counsel must spend with a defendant to ensure that the representation does not fall below an objective standard of reasonableness." *State v. Bair*, 2012 UT App 106, ¶ 57, 275 P.3d 1050 (quotation simplified).

¶98    On this issue, we first note that Counsel's ability to meet with Draper was impaired in the early stages of the case by circumstances that were outside Counsel's control. In her affidavit, Lead Counsel states:

> One of the major issues we had in preparing for trial was our inability to have regular, confidential contact with [Draper] in the jail. . . . We were aware that our calls were likely being monitored and when we attempted to schedule to meet with [Draper], we were unable to do so. Some of this was due to the global pandemic but I was told . . . that in-person visits were not allowed.

Lead Counsel then avers that, at her request, the prosecutor "communicated with the jail to ensure in-person visits would be facilitated." And in his affidavit, Draper explains that his father spoke with "the head of State corrections" to ensure that in-person visits could occur. Draper does not dispute that any of this occurred, nor has he persuasively argued that there was anything more that Counsel should have done in the early stages of the case to overcome the access problems that were created, in part, by the COVID-19 pandemic.

¶99 What we're left with, then, is Draper's assertion that, after those problems were resolved, Counsel met with him just twice and that both meetings were held shortly before trial. But again, we've been cautioned against imposing "detailed guidelines" or "rigid requirements" for reasonable performance, *Strickland*, 466 U.S. at 690, and we've declined to set forth a particular "amount of time counsel must spend with a defendant to ensure that the representation does not fall below an objective standard of reasonableness," *Bair*, 2012 UT App 106, ¶ 57 (quotation simplified). Moreover, although Draper avers that he met with Counsel only twice, he says nothing about how long those meetings were. But under *Strickland*, we must "indulge a strong presumption that counsel's conduct" *did* fall "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.[10]

¶100 To the extent that Draper has asked for a remand relating to Counsel's alleged failures to discuss certain subjects with him during those meetings, we'll address those claims below. But in light of the *Strickland* presumption and our prior caselaw, we see no basis for holding that Counsel performed deficiently simply based on the number of in-person meetings. We accordingly decline to remand on this basis.

---

10. Although it's a touch tangential to the issue of whether the number of meetings was sufficient, Draper's affidavit does provide some indication that these meetings were more than perfunctory. For example, Draper avers that, during those meetings, he was given some of the police reports and portions of several victim interviews to review, that he and Counsel discussed "text messages recovered from [his] phone" and how they could support the defense, and that he and Counsel discussed "a few of the reports that would show the witnesses were untruthful."

## 2. Failure to Consult About Waiving the Preliminary Hearing

¶101   Draper next asks for a remand to show that Counsel did not adequately consult with him about his decision to waive his right to a preliminary hearing in exchange for being able to hold informal interviews with the victims. In his affidavit, Draper says that he "was not told the reason for not having the preliminary hearing until after" the decision was already made. But even with this proffer, there are two reasons why Draper has not shown that he was prejudiced by any such consultation failure.

¶102   First, even if it were true that Counsel did not tell Draper about the reason for waiving the preliminary hearing during one of the pretrial meetings, it's also unquestionably true that Draper was told those reasons by Counsel in open court. The record shows that Draper was present at the hearing when the district court and the attorneys for both sides discussed the plan to waive the preliminary hearing and instead hold informal interviews. During that hearing, Counsel explained to the court that this proposal would be helpful because electronic preliminary hearings were hard to conduct, this format would more easily accommodate the large number of witnesses involved, and this option would help reduce any unnecessary delays. Draper would have heard this, and he would have likewise heard the prosecutor assure the court that "Draper could ask for his [preliminary hearing] anytime prior to entering the plea . . . if the other alternative meetings don't give them what they think they need." Indeed, at the close of that hearing, the court addressed Draper directly, telling him that he could "change [his] mind, and ask for a preliminary hearing." The court reminded Draper that he had a right to a preliminary hearing and then asked him whether he agreed to "conditionally" waive it. Draper responded that, on the advice of Counsel, he would do so.

¶103   We've previously held that a defendant cannot prevail on an ineffective assistance claim based on a lack of information from counsel if the record shows that the defendant received the

relevant information from another source. *See McCormick v. State*, 2014 UT App 49, ¶ 3, 321 P.3d 1172 (per curiam) (denying an ineffective assistance claim where the attorney had commented "that by pleading guilty, [the defendant] would probably only spend a few days in jail," where the court's plea form "clearly informed [the defendant] that he could be sentenced to the maximum penalty allowed by law"). Here, even if it's true that Counsel did not tell Draper the reasons for waiving the preliminary hearing during their pretrial meetings, it's also true that Draper was apprised of these reasons during the pretrial hearing in court. For this reason alone, he cannot show prejudice.

¶104 Second, though perhaps a touch unclear, we understand this claim to ultimately be grounded in the suggestion that Draper would not have waived his right to a preliminary hearing if he had been properly advised. But it's settled in Utah that "conviction beyond a reasonable doubt cures any flaw in a preliminary hearing—including the complete deprivation of a preliminary hearing." *State v. Aleh*, 2015 UT App 195, ¶ 18, 357 P.3d 12; *see also id.* ¶ 18 n.2. Here, Draper was convicted of various charges at the close of the trial. As a result, even if Counsel performed deficiently by not consulting with Draper about the decision to waive the preliminary hearing, and even if that failure led Draper to waive it where he might not have done so otherwise, Draper cannot show prejudice. For this reason too, we have no reason to order a remand.

3.  Failure to Advise Draper About His Right to Testify

¶105 Finally, Draper claims that, during both their pretrial meetings and again during trial, Counsel did not properly advise him of his right to testify or prepare him to testify. In his affidavit, Draper says that he "believed that [he] would be testifying" in his "own defense" and that he "believe[d]" his testimony "was necessary to show the jury that what [the victims] said was not what happened." Draper says that Counsel told him that Counsel

would decide if he should testify and that, if Counsel decided that he would testify, Counsel would come to the jail and prepare him before that testimony. Draper then avers that Counsel never came to the jail or prepared him to testify, and he further says that he "relied on the advice of [his] attorneys on whether or not to testify."

¶106 From these and other statements Draper made in his affidavit and rule 23B motion, we understand Draper to be asserting that Counsel both did not advise him that he had the right to decide whether to testify and was ineffective for not recommending that he choose to testify. And we further understand Draper to be asserting that, if he had been properly advised, he would have chosen to testify at trial.

¶107 While certain "[t]rial management" decisions are the "lawyer's province," "[s]ome decisions" "are reserved for the client"—including, notably, the decision whether to "testify in one's own behalf." *Mccoy v. Louisiana*, 584 U.S. 414, 422 (2018). Thus, while an attorney may advise a defendant not to exercise the right to testify, *see State v. Martinez*, 2020 UT App 69, ¶ 51, 464 P.3d 1170, "[t]he defendant retains ultimate authority in deciding whether or not to testify," *State v. Brooks*, 833 P.2d 362, 364 (Utah Ct. App. 1992). Moreover, as noted above, we've recognized that defense attorneys have "particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of prosecution." *Strickland*, 466 U.S. at 688. We therefore have no difficulty concluding that a defense attorney must advise a defendant that he or she has the right to testify and provide reasonable consultation about the potential exercise of that right. But even assuming that Counsel failed to comply with that duty in this case, we still deny Draper's request for remand because Draper has failed to show that he was prejudiced by this deficiency such that "the result of the proceeding would have been different" if he had been properly advised. *Miller*, 2023 UT App 85, ¶ 27 (quotation simplified).

¶108 As noted, Draper submitted his own affidavit in support of this motion. His affidavit is 20 pages, and it includes a detailed account of the testimony that Draper says he would have offered at trial, with separate subheadings setting forth his proposed testimony about each victim. At the broadest level, we note that Draper denies having sexually assaulted any of the victims. And more particularly, Draper explains on a victim-by-victim basis why he thinks each victim was lying in her testimony.

¶109 But our consideration of this question is not limited to Draper's affidavit. In determining whether a defendant was prejudiced by trial counsel's deficient performance, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see also King*, 2012 UT App 203, ¶ 46 ("When we examine counsel's alleged errors, we consider the totality of the evidence to determine whether the errors altered the entire evidentiary picture and whether the verdict is supported by the record." (quotation simplified)). Moreover, we also "assess counterfactuals scenarios" of "what would have happened but for the ineffective assistance." *Ross v. State*, 2019 UT 48, ¶ 76, 448 P.3d 1203. And "we may do so with the evidence available to us, even when not part of the original record." *State v. Ames*, 2024 UT App 30, ¶ 19, 546 P.3d 356 (quotation simplified), *cert. denied*, 550 P.3d 993 (Utah 2024).

¶110 The prejudice question before us here is whether it's reasonably likely that, if Draper had testified as indicated in his affidavit, he would have received a better outcome at trial. In Draper's view, the benefits of his proposed testimony are clear enough. If he had testified, the jury would have now heard him say, under oath, that he did not have nonconsensual sex with any of the victims. And the jury would have also heard his explanations for why he thought the victims were falsely accusing him.

¶111   But even so, Draper has not persuaded us that there is a reasonable likelihood that his proposed testimony would have resulted in a more favorable verdict on any count. In assessing this, we start with the testimony that was presented against him originally. We recounted that testimony above and need not repeat it here. Focusing more specifically on Draper's proposed testimony, we note that it's decidedly problematic on any number of levels—both in terms of problematic things that Draper tells us he would have said, as well as through damaging information that's in the record that the State very likely would have offered in response. We need not and do not recount all of the potential problems here. We highlight three of them to illustrate the nature of our conclusion.

¶112   **First, evidence about Nora.** In his affidavit, Draper opines that the "case really begins and ends with" Nora. Draper then spends over six pages of his affidavit setting forth his proposed testimony about Nora, which is nearly equal to the space he gives to his proposed testimony about the remaining victims combined. Our focus will follow suit.

¶113   Much of Draper's proposed testimony about Nora seeks to cast her as playing an aggressive and even controlling role in their relationship. For example, Draper says that he would have testified that he and Nora were in a "volatile relationship" and that she had hit him "a lot" towards the end of their relationship. But if Draper had testified in this manner, he would have opened the door to a large amount of damaging information about his own actions in that relationship that the State could—and, according to the State on appeal, would—have offered in response. As part of Draper's rule 23B submission, Draper attached police reports from officers who investigated the case. In one report, an officer recounts that Nora said that Draper had "threatened suicide every time she tried to break up with him or leave him." In that same report, Nora said that on one occasion after she had an argument with Draper, Draper drove her down a dirt road, got out, put a "gun to his head and pulled the hammer

back" before Nora was able to calm him down. Nora also said that on another occasion, Draper had "sent her a picture of a shotgun in the vehicle and a text that said he was going to kill himself because of her," and according to the report, Nora provided a copy of that text and picture to law enforcement.

¶114  In another incident recounted in those same reports, Nora described what had happened on a trip she had taken with Draper to Las Vegas. According to Nora, during that drive, Draper "twisted her arm and held it up behind her back, forcing her body to go forward" in order to "get her phone away from her." She said that while they were later stopped at the side of the road, Draper "grabbed her by the back of the neck," after which they had a struggle that left Nora with a bloody nose and a bruised eye, and Nora told officers that she had a video of that bruise. In another incident that Nora described, Draper allegedly squeezed her arm so hard that it resulted in "small fingertip like bruises on both arms," and Nora told officers that she had a photo of these bruises.

¶115  In yet another alleged incident, Nora claimed that Draper followed her home after work even though she told him she did not want him to do so, that Draper followed her inside her home, and that when she tried to leave, Draper "locked the front door, the door to the garage[,] and the back door," and "he then followed her around the house making sure she did not leave." According to the officer's notes, Nora provided security camera footage from inside her home that corroborated these claims.

¶116  Separate from these allegations, we note that in Draper's own affidavit, he says that he told Nora at one point that "unless she was willing to talk to [him] about the relationship issues [they] were having," he would tell her parents and church leader about their sexual relations. To some people, this may have seemed to be a manipulative and controlling threat.

¶117  There are other incidents of a similar nature in the record. As a result, if Draper had testified about Nora in the manner he

proposes in his affidavit, the very likely result would have been the State then putting on evidence in rebuttal of a number of incidents in which Draper was volatile, sometimes violent, and often controlling toward Nora. If the point of Draper's proposed testimony was to undermine Nora's credibility on this basis, it seems clear enough that it would have had a similar (if not greater) effect on his own credibility as well. And in the broader context of a case that centered in no small measure on various victims' claims that Draper refused to take no for an answer, the damaging effect of the testimony recounted above could and likely would have been pronounced.

¶118 **Second, inconsistencies.** In August 2019, Draper gave an interview to law enforcement during which he was asked about his relationships with some of the victims. As the State points out, Draper gave a number of inconsistent or shifting answers—all of which could have been used to impugn his credibility during cross-examination if he had testified. These include the following:

- Draper told officers that he could never have had sex in the front seat of his car because "it's just too small in my car, I can't do anything, it's just too small." But in response to further questions from officers, Draper admitted that he did have sex with Nora in the front seat of his car, but he then claimed that "it was consensual every single time."

- When Draper was asked if he and Nora had ever done anything sexual while driving between Monticello and Moab, he first said that he thought "the only time [they] did stuff in the car might have been up the mountain." But a short time later, he changed his story entirely, saying, "I don't know it has happened so many times, I can't even remember half of them."

- Draper was asked about Nora's account of the incident in which he had gone to her house uninvited and then refused to leave. At first, Draper specifically denied

unplugging the video camera. But when he was confronted with video footage that showed him unplugging it, Draper changed his answer, saying, "yeah, I unplugged it, I'm admitting that."

¶119 Aside from the internal inconsistencies, Draper also made a number of statements that were contradicted by physical evidence:

- During the interview, Draper denied that he was suicidal. He also stated, "I have never had a gun with [Nora], I've never showed her a gun, I've never [waved] a gun at her, nothing." But as noted, law enforcement had evidence that Draper sent Nora a picture of a shotgun and a text from Draper saying that he would kill himself because of her.

- Draper told officers that the relationship with Nora never included "punching or hitting or holding down" and that "[t]he only person that hit in this relationship was [Nora]." But as indicated, law enforcement had testimony and photo evidence showing that Draper had physically harmed Nora.

- In his rule 23B affidavit, Draper says he would have testified that his relationship with Nora was "100% consensual" and "very much a two-sided relationship." But the State could have presented some of the evidence referenced above, as well as a number of text messages in which Nora repeatedly told Draper that she did not want to see him and in which Draper pressed her for a relationship anyway.

¶120 From these and other instances in the record that are highlighted in the State's appellate filings, it's clear enough that, if Draper had testified, the State had multiple pieces of evidence from which it could directly impeach his credibility. Indeed, Draper's own appellate filings tacitly recognize that his credibility

could have been impugned. After the State pointed out Draper's credibility problems in its opposition to the rule 23B motion, Draper suggested in his reply that, in the identified instances, he "wasn't being dishonest—he was eighteen years old and communicated poorly."

¶121 But since the apparent goal of Draper's testimony would have been to convince the jury that he never had nonconsensual sex with any of the victims, and since the success of that endeavor would have turned in no small part on his credibility, giving the State the opportunity to highlight his own shifting stories and the many instances in which his accounts conflicted with physical evidence could well have undermined his own case.

¶122 **Third, cumulative evidence.** Finally, we note that much of the proposed testimony set forth in Draper's affidavit would have been cumulative of information provided by other witnesses at trial. In past cases, we've recognized that the absence of otherwise cumulative evidence is less likely to be prejudicial. *See, e.g.*, *King*, 2012 UT App 203, ¶ 34. Here, these include, but are not limited to, the following.

- Draper says that he would have testified that Nora "solicited everyone else to say these things against [him]." But as noted above, the jury already heard that Nora had spoken with at least one of the other victims about "the situation" with Draper.

- Draper says that he could have explained that Diane was motivated to lie about the incident at the lake because she wanted to sue him or was jealous of his relations with other girls. But at trial, Counsel elicited testimony from other witnesses about both things.

- Draper says in his affidavit that he would have testified that Nora became "upset" and "afraid" when he threatened "to disclose [their] sexual relationship" to her

parents and church leader, and he then suggests that this is what prompted her to falsely accuse him of raping her. But evidence of Nora's religiosity and preference to stay celibate until she was married already came up several times during her testimony, and it was referenced again in closing argument.

¶123   In sum, with respect to Draper's assertion that Counsel's lack of proper consultation resulted in him not testifying when he otherwise would have, we're sensitive to the conceptual complexity of the task at hand. As presented to us, we're being asked to evaluate the potential impact of testimony that was never given on a trial that we didn't see. But even so, this is the question before us, and under controlling authority, Draper is not entitled to a remand unless the evidence that he proffers persuades us that there's a reasonable probability he would have received a more favorable outcome, even when considered alongside the other evidence that's already in the record and the likely responses from the State. Here, we have carefully evaluated Draper's affidavit, the trial record, and the arguments made by counsel for both sides about the likely impact of Draper's proposed testimony. In light of the above, we don't believe that there's a reasonable probability that Draper's proposed testimony would have led to a more favorable outcome at trial. We accordingly deny his request for a remand on this issue.

C.   Impeachment and Defense Evidence

¶124   Finally, Draper asks for a remand on a series of claims about whether Counsel was ineffective for not impeaching the victims with available evidence or offering certain defense-favorable evidence in the case-in-chief. Draper points to a large number of potential examples, and we have considered each of them. But "an appellate court has discretion as to the nature and extent of the opinions it renders and we need not address in writing each and every argument, issue, or claim raised and properly before us on appeal." *State v. Payne*, 964 P.2d 327, 332 n.3

(Utah Ct. App. 1998) (quotation simplified). In our view, none of the identified claims justify a remand. We address just a few of the claims for which we think some analysis is justified or otherwise helpful.[11]

---

11. In conjunction with this claim, Draper asks for a remand to support the claim that Counsel was ineffective for not ensuring that the informal interviews with the victims were recorded. In Draper's view, the lack of recordings impaired Counsel's ability to attack the credibility of the victims at trial with information obtained in those interviews.

    In opposing this request, the State initially suggests that Draper has not shown that Counsel acted deficiently. After all, as the State points out, Lead Counsel's affidavit indicates that she and co-counsel were both present and took detailed notes during the interviews. That affidavit further shows that an investigator was also present during those interviews and could have testified at trial if any victim said anything that contradicted statements she made in her interview. In the State's view, this, alone, was sufficient under prevailing professional norms.

    But on the record before us, it remains unclear whether Counsel consciously chose to forego recording the interviews, or whether the non-recording was instead unintended. Regardless, we need not decide whether Counsel performed deficiently in this regard. As noted, a remand is only warranted if Draper shows both deficient performance and prejudice. And Draper's claim of prejudice for the lack of recording turns on Counsel's alleged inability to use the information obtained during the interviews to impeach the victims at trial. For the reasons set forth below, we conclude that Draper was not prejudiced by any failure to impeach any of the victims. As a result, we likewise conclude that he has not shown that he was prejudiced by Counsel's failure to ensure that the interviews were recorded.

1.    Helen's Poor Memory

¶125  Draper faults Counsel for not introducing a portion of Helen's CJC interview in which she said, "I have a really bad memory, so it's going to take me a minute." But during her trial testimony, Helen said at least eighteen times that she did not remember something or that she was uncertain about a particular detail. Some of these instances were about fairly benign things, while others were about more important things (such as what caused the end of her relationship with Draper). But regardless, in light of these many examples, the jury didn't need to hear her additional acknowledgment that she had a bad memory in order to understand that her memory wasn't always clear. Since this statement was cumulative of other evidence, Counsel could have reasonably decided not to introduce it, and we likewise see no basis for concluding that its absence prejudiced Draper.

2.    Diane's Other Conversations

¶126  Draper faults Counsel for not eliciting testimony from Diane during cross-examination that she spoke with "multiple individuals about the allegations before speaking to law enforcement." But in cross-examination, Counsel elicited testimony from Diane that she had spoken with her friend, her sister, Nora, her mother, and Victim Advocate. While Draper now argues that Counsel should have elicited testimony that Diane also told her boyfriend and another friend, he does not demonstrate that adding these two names into the mix would have altered the evidentiary picture in anything approaching a meaningful way. As a result, Counsel could have reasonably decided not to elicit this information, and we see no basis for concluding that its absence prejudiced Draper.

3.    The Nature of Draper and Nora's Relationship

¶127  Draper argues that Counsel should have introduced a statement from Nora's protective order request in which she said, "We     discussed     and     agreed     to     being     each     other's

boyfriend/girlfriend." Draper says this statement could have been used to contradict Nora's trial testimony that her "boyfriend/girlfriend" relationship with Draper was "against [her] will from the beginning." In his affidavit, Draper likewise says that he would have testified that when he was served with that protective order, Nora "made many, many allegations of physical and sexual abuse" against him, but that he was prepared to testify that none of them were true.

¶128   In a recent case, however, this court affirmed a suppression ruling precisely because the evidence in question may have led the jury to hear that the defendant had a protective order against him. *See State v. Lewis*, 2024 UT App 96, ¶ 36, 553 P.3d 1081, *petition for cert. filed*, Sept. 11, 2024 (No. 20240969). In the court's view, that would have created the impermissible "risk that the jury would improperly consider" the defendant's "conduct that gave rise to issuance of the protective order." *Id.*[12]

¶129   Unlike that case, the claim here arises in the ineffective assistance context. But this context is all the more reason why the claim fails. Here, even if Counsel could have impeached Nora about whether she initially agreed to be Draper's girlfriend, using the protective order for this purpose would have now informed the jury that Nora had obtained a protective order against Draper, and Counsel could readily have thought that the downside of the jury learning about this far exceeded any upside. This was not deficient performance, and no remand is warranted on this claim.

---

12. There was a dissent in *State v. Lewis*, but the dissenting judge likewise agreed that "a defendant might be unfairly prejudiced if a jury unnecessarily learns that there was a protective order against the defendant." 2024 UT App 96, ¶ 74 n.16, 553 P.3d 1081 (Tenney, J., dissenting), *petition for cert. filed*, Sept. 11, 2024 *(No. 20240969).

4.    Diane's Video

¶130   Finally, Draper faults Counsel for not seeking to introduce a video that Draper says he "received from Diane on the night of the alleged rape." In his affidavit, Draper says, "After I left, [Diane] sent me a video of her dancing around the campfire at the lake." In Draper's view, this video would have contradicted Diane's claim at trial that, after the rape (and the alleged assault), she went home immediately and was in a traumatized state.

¶131   We're not persuaded that this proposed evidence would have meaningfully impacted the evidentiary picture. As a starting place, Draper never says that he has any information about when the video was *taken* (as opposed to when it was *sent*). Thus, to the extent that the proffer might be read to suggest that Diane was dancing after the time that she claims she had been raped and assaulted, the proffer is inadequate to establish this.

¶132   But Draper's proffer really seems directed at the assertion that the video could have at least shown that, contrary to her claim at trial, Diane was happily communicating with him after the rape. Even if Counsel had introduced the video in question, and even if this had contradicted Diane's testimony in some measure, we're not persuaded that there's a reasonable likelihood that this would have mattered. After all, as the State points out, it's widely understood that rape victims do not always act in a particular way. *See, e.g., State v. Torres-Orellana*, 2021 UT App 74, ¶ 33 n.12, 493 P.3d 711 (noting that a victim's "expressions of affection toward" the defendant were "not necessarily inconsistent with rape"), *cert. granted*, 503 P.3d 268 (Utah Dec. 9, 2021) (No. 20210634); *State v. Nunes*, 2020 UT App 145, ¶ 30 n.12, 476 P.3d 172 ("[D]espite the persistence of certain cultural myths, not all rape victims will . . . have no further interaction with their rapists."); *State v. Jok*, 2019 UT App 138, ¶ 24, 449 P.3d 610 ("[R]ape victims display a diverse range of reactions to the harm they suffered."), *aff'd*, 2021 UT 35, 493 P.3d 665; *State v. Heath*, 2019 UT App 186, ¶¶ 49–50, 453 P.3d 955 (affirming a jury conviction of sexual

battery against a chiropractor even though the patient continued to see that same chiropractor after the criminal conduct).

¶133 In the counterfactual world in which Counsel had attempted to impeach Diane with this video, the likely response would have been clear and plausible enough—that in the immediate wake of being sexually assaulted by someone she had regarded as a close friend, Diane's emotions were unsettled and she was unsure how to react. And when viewed alongside all the other testimony presented at this trial, whether it be from Diane or the other witnesses, we're not convinced that there's a reasonable possibility that introducing this video would have resulted in a more favorable outcome here. We accordingly deny Draper's request for a remand on this issue.

CONCLUSION

¶134 For the foregoing reasons, we affirm Draper's convictions and deny his request for a rule 23B remand.

———————